UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the matter of | Case No. 06-22306 (ASH) |
| BAYOU GROUP, LLC, et al., | Jointly Administered |
| Debtors. | |

| | |
|---|---|
| CHRISTIAN BROTHERS HIGH SCHOOL ENDOWMENT, | **MEMORANDUM OPINION AND ORDER** |
| Appellant, | |
| -against- | 09 Civ. 02577 (PGG) |
| BAYOU NO LEVERAGE FUND, LLC, | |
| Appellee. | |

| | |
|---|---|
| REDWOOD GROWTH PARTNERS, | |
| Appellant, | |
| -against- | 09 Civ. 02313 (PGG) |
| BAYOU ACCREDITED FUND, LLC, | |
| Appellee. | |

| | |
|---|---|
| D. CANALE BEVERAGES, INC., | |
| Appellant, | |
| -against- | 09 Civ. 02340 (PGG) |
| BAYOU SUPERFUND, LLC, | |
| Appellee. | |

HERITAGE HEDGED EQUITY FUND, L.P.,

                Appellant,

        -against-              09 Civ. 02343 (PGG)

BAYOU SUPERFUND, LLC,

                Appellee.

---

JOHN D. CANALE, III,

                Appellant,

        -against-              09 Civ. 02345 (PGG)

BAYOU SUPERFUND, LLC,

                Appellee.

---

MARY P. SMYTHE RESIDUARY TRUST,

                Appellant,

        -against-              09 Civ. 02347 (PGG)

BAYOU SUPERFUND, LLC,

                Appellee.

---

MARVIN E. BRUCE LIVING TRUST,

                Appellant,

        -against-              09 Civ. 02351 (PGG)

BAYOU SUPERFUND, LLC,

                Appellee.

FREESTONE LOW VOLATILITY
PARTNERS, LP,

                              Appellant,

              -against-                              09 Civ. 02353 (PGG)

BAYOU ACCREDITED FUND, LLC,

                              Appellee.

PAUL G. GARDEPHE, U.S.D.J.:

                These eight appeals arise from adversary proceedings Bayou Hedge Funds

(the "Funds," "Bayou," or "Debtors") brought under §§ 548(a) and 544 of the

Bankruptcy Code and §§ 273-76 of the New York Debtor and Creditor Law ("DCL") to

recover – as fraudulent conveyances – redemption payments the Funds made to

Appellants within two years of the Funds' collapse in August 2005.[1]  (Am. Cmplt. ¶ 3

(CBHSE Ex. 1))  Appellants[2] appeal from a decision and orders of the United States

---

[1]  Under these statutes, fraudulent conveyance claims "may be brought by or on behalf of
the debtor for the benefit of creditors."  In re Bayou Group, LLC, 372 B.R. 661, 664
(Bankr. S.D.N.Y. 2007) ("Bayou II").

[2]  Appellants Redwood Growth Partners, L.P., D. Canale Beverages, Inc., Heritage
Hedged Equity Fund, L.P., John D. Canale, III, the Mary P. Smythe Residuary Trust, and
the Marvin E. Bruce Living Trust (the "Sonnenschein Appellants") invested in either the
Bayou Superfund or the Bayou Accredited Fund.  (Sonn. Br. 26)  Redwood and Heritage
are each a fund of funds.  In re Bayou Group, LLC, 396 B.R. 810, 874 (Bankr. S.D.N.Y.
2008) ("Bayou III"); Sonn. Br. 25, 29.

Christian Brothers High School Endowment ("CBHSE") invested in the Bayou No
Leverage Fund and is a fund of funds owned by, and responsible for managing the
endowment of, Christian Brothers High School in Memphis, Tennessee.  Bayou III, 396
B.R. at 874; (see also CBHSE Br. 5).

Freestone Low Volatility Partners invested in the Bayou Accredited Fund and is a fund of
funds.  Bayou III, 396 B.R. at 880; (see also Freestone Br. 5).

Bankruptcy Court for the Southern District of New York, dated October 16, 2008, and January 28, 2009, respectively, granting Debtors summary judgment on their claims to avoid and recover payments made to Appellants in redemption of their principal investments and fictitious profits, and denying Appellants' cross-motions for summary judgment on their good faith defense under 11 U.S.C. § 548(c).[3]  In granting Debtors summary judgment, the Bankruptcy Court held that $24.7 million in pre-petition redemption payments made to Appellants – reflecting both return of investment principal and fictitious profits – could be avoided under Section 548.

Critical to the Bankruptcy Court's determination that the redemption payments could be avoided as actual fraudulent conveyances was its ruling, as a matter of law, that Appellants could not prevail on their good faith affirmative defense.  That finding is premised on a novel interpretation of the test for good faith under Section 548(c) of the Bankruptcy Code, which the lower court conceded "may be thought to differ in some respects from the case law."  Bayou III, 396 B.R. at 847.  In contrast to the vast weight of authority holding that a transferee is put on "inquiry notice" only upon receiving information indicating that the transferor is insolvent or that the transfer is being made for a fraudulent purpose, the Bankruptcy Court broadly held that information suggesting "some potential infirmity in the investment" or "some infirmity [in the] integrity of its management" is a sufficient trigger.  Id. at 848.  The Bankruptcy Court's

---

[3]  This Court has jurisdiction over these appeals pursuant to 28 U.S.C. § 158(a), which grants federal district courts jurisdiction to hear appeals from final judgments, orders and decrees of the bankruptcy courts.

expansion of the scope of information sufficient to trigger inquiry notice is not supported

by the case law and requires reversal of its decision granting Bayou summary judgment.

## BACKGROUND

The factual background of these appeals is discussed in detail in three

prior decisions issued by the Bankruptcy Court, with which this Court presumes

familiarity.  See In re Bayou Group, LLC, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ("Bayou

I"); Bayou II, 372 B.R. 661; Bayou III, 396 B.R. 810.  The essential facts concerning the

rise and fall of the Bayou Funds are not in dispute.

### A.    The Bayou Funds

In 1996, Sam Israel, Daniel Marino, and James Marquez organized the

Bayou Fund, a hedge fund that served large, primarily institutional investors.  Bayou III,

396 B.R. at 822.  In 2003, the original Bayou Fund was liquidated and was replaced by

four on-shore hedge funds, all of which were limited liability companies.  Id.  Three of

these funds – Bayou No Leverage Fund, Bayou Accredited Fund, and Bayou Superfund –

are Appellees in this action.[4]  (Am. Cmplt. ¶ 17)

Throughout their existence, all the Bayou funds were managed by Bayou

Management LLC, which was owned by Israel, and all related trading activity was

conducted through Bayou Securities, a broker-dealer owned by Bayou Group, LLC.

Bayou III, 396 B.R. at 822.  Until Bayou's collapse in 2005, Israel and Marino controlled

the operation of all the Bayou entities, serving respectively as chief executive officer and

chief financial officer of Bayou Management.  Id.

---

[4]  The fourth offshoot of the Bayou Fund was available only to Bayou employees and
affiliates.  (Id.)

The Bayou Fund began losing money soon after it began trading, and neither it nor its successor funds was ever profitable.  Id.  In addition to the trading losses they incurred, Israel and Marino plundered the Funds for their personal financial gain, generating millions of dollars in excessive trading commissions and awarding themselves millions in incentive bonuses based on non-existent profits.  Id. at 823.  In order to conceal their trading losses and self-dealing, and to attract additional investment, the Funds misrepresented their performance through false and fraudulent reports, releases, and financial statements.  Id.; (see also Am. Cmplt. ¶ 12).  For example, false performance returns were reported to investors in weekly, monthly, quarterly and annual financial reports, in individual account statements, and in Bayou's marketing materials. Bayou III, 396 B.R. at 823.

In 1998, in furtherance of their fraudulent scheme, Israel and Marino fired Bayou's independent auditor and replaced that firm with Richmond-Fairfield Associates, CPA, PLLC, a fictional accounting firm created by Marino to pose as an independent auditor.  Id.; (see also Sonn. Ex. 1, ¶¶ 21-22).  The Bayou Funds' subsequent annual financial statements contained a certification from Richmond-Fairfield stating that it was an independent firm of certified public accountants, that it had audited the financial statements of the applicable Bayou fund, that the audit had been conducted in accordance with generally accepted accounting standards, and that the Fund's financial statements "present fairly, in all material respects, the financial position of [the fund] and the results of its operations."  Bayou III, 396 B.R. at 823.  All of these representations were false. Id.

Another critical component of the fraud scheme was the Bayou Funds'

consistent execution of investors' redemption requests in accordance with the Funds'

operating agreements:

> To avoid detection of the fraud, to retain existing investors and to lure new investors, the Bayou Hedge Funds invariably honored requests by investors who sought to exercise their contractual right to redeem their investments as falsely reported in the fraudulent financials, both as to impaired or non-existent principal and fictitious profits. These redemption payments thus constituted an integral and essential element of the alleged fraud, necessary to validate the false financials and to avoid disclosure.

Bayou II, 372 B.R. at 663.

Although one investor learned from New York Department of State

records in July 2004 that the registered agent for Richmond-Fairfield was Dan Marino,

Bayou III, 396 B.R. at 865 – indicating that Bayou's representation of Richmond-

Fairfield as an independent auditing firm was a fiction – the Bayou Funds' fraudulent

scheme was apparently never detected by investors or by regulators prior to the Funds'

collapse. The end came in July 2005, when the Bayou Funds notified investors that they

were voluntarily liquidating, and that all investors would receive a 100% redemption of

their investments upon completion of a final audit. (CBHSE Ex. 1, ¶ 22) Bayou's

investors received no further distributions from the funds, however. Bayou III, 396 B.R.

at 823.

Over their lifespan, the Bayou Funds attracted more than $450 million

from investors. Id. at 829. When the funds collapsed in the summer of 2005, investors

sustained losses of approximately $250 million in invested principal. Id. at 823.

**B.**    **Criminal Proceedings**

On September 29, 2005, Israel and Marino pleaded guilty in the United

States District Court for the Southern District of New York to criminal informations

charging them with, <u>inter alia</u>, conspiring to commit, and with the commission of, investment adviser fraud and mail fraud.  (Sonn. Ex. 3)  The informations charged that Israel and Marino had provided newsletters, reports, and financial statements setting forth inflated rates of return for the Bayou Funds, and had falsely represented to investors that Bayou's financial statements had been audited by an independent certified public accounting firm, when in fact Israel and Marino had created a sham accounting firm that conducted no audits.  (<u>Id.</u>)  The informations further alleged that between July 1996 and August 2005, Israel and Marino had, through this fraudulent scheme, "induced investors to contribute in excess of $450,000,000 to the Bayou Hedge Funds."  (<u>Id.</u> at 4)

During his plea allocution, Israel admitted that he had "caused Bayou to send various kinds of documents containing false financial information about Bayou's performance to current and prospective clients of Bayou which made it appear that Bayou was performing better than it truly was.  My purpose was to induce these people to invest in Bayou or continue to keep their money in Bayou."   (Pltf. Ex. 3 at 24 (Israel Plea Tr.)); <u>see</u> <u>Bayou III</u>, 396 B.R. at 830.  Marino similarly admitted that while serving as chief financial officer of Bayou he and others had intentionally sent false information to investors concerning "the true status of their investment," and that he had "set up an accounting firm that would give the appearance of an independent auditor to further the conspiracy to deceive Bayou investors."  (Pltf. Ex. 4 at 27-28 (Marino Plea Tr.))

On December 14, 2006, James Marquez, a principal at Bayou until 1999 and the portfolio manager for the Bayou Fund, also pleaded guilty to charges of conspiracy to commit investment adviser fraud and mail fraud, among other crimes.  (<u>See</u> Pltf. Ex. 5 at 20-22 (Marquez Plea Tr.))  Marquez admitted that he was aware of the

trading losses that the Bayou Fund was suffering and that he caused inaccurate financial statements to be sent to investors "that made it appear that the fund was more successful than it actually was." (Id. at 20)   Marquez further admitted that he was aware of the creation of Richmond-Fairfield and knew that it had been "formed to handle the audits for the Fund with the intent that the true financial status of the Fund not be disclosed to investors." (Id. at 10); see Bayou III, 396 B.R. at 830.

     **C.**      **The Pre-Dissolution Redemptions**

Appellants are investors in the Bayou Funds who redeemed their investments within two years of the Funds' collapse in the summer of 2005.[5]   The Operating Agreement for each Fund governed the terms of these redemptions (Sonn. Exs. 26, 27), and permitted investors to redeem at the end of any calendar month by providing 15 days written notice.  (Id. at § 10.1)  Under the Operating Agreements, after a notice of redemption was received, the fund would pay "90% of the amount [in the particular investor's] Capital Account . . . within thirty (30) days of the effective date of the withdrawal."  (Id. § 10.4)  "[T]he balance of the amount due [would be paid] within thirty-one (31) days after the Company ha[d] received financial statements for the year ending as of the withdrawal date."  (Id.)

Each of the Appellants redeemed the principal amount of their investments in the Bayou Funds – along with the fictional profits reflected on their account statements – within two years of the initiation of bankruptcy proceedings.  See 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor . . . incurred by the

_____

[5]  All Appellants but Freestone redeemed their Bayou investments in June 2004.  (Sonn. Ex. 33 (Wade Dep.) at 45-46; CBHSE Ex. 11 (Sullivan Aff.), ¶¶ 39, 42).   See also Bayou III, 396 B.R. at 874-77.  Freestone redeemed on October 28, 2004.  (Freestone Ex. 12)

debtor, that was made or incurred on or within 2 years before the date of filing of the petition. . . .").

### D.    **Bankruptcy Court Proceedings**

On March 27, 2006, a group of unsecured, non-redeeming investors referred to as the Unofficial On-Shore Creditors Committee filed a civil complaint in this district against Israel, Marino, the Bayou Hedge Funds, and their affiliate entities.[6] (Sonn. Ex. 6)  The complaint alleged violations of Section 10(b) of the Securities Act of 1934 and Rule 10b-5 as well as state law causes of action for fraud and breach of fiduciary duty.  (Id.)  The complaint sought appointment of a receiver to prosecute claims on behalf of Bayou Group and to develop a plan of distribution for creditors.  (Id.)  On April 28, 2006, the District Court appointed Jeff Marwil to serve as receiver of Bayou Group, LLC and a number of related Bayou entities, including all of the Bayou funds named in this litigation.  (Sonn. App., Ex. 7 at 2)

On May 30, 2006, the Bayou Funds and related entities each filed petitions for relief under Chapter 11 of the Bankruptcy Code.  (Sonn. Ex. 9 ¶ 1)  The Debtors subsequently initiated approximately 120 actions (Bayou Br. 2-3), including those now on appeal, seeking to recover as fraudulent transfers "the principal and fictitious investment gains fraudulently transferred to redeeming investors so that the funds can be

_____

[6]  On June 15, 2006, the United States Trustee for this region appointed an Official Unsecured Creditors' Committee to represent unsecured creditors of the Bayou Funds. (Sonn. Ex. 8)

equitably redistributed pro-rata to all of the Bayou Entities' creditors."[7]  (Am. Cmplt. ¶ 2)[8]

Debtors allege that the Bayou Funds were operated as a Ponzi scheme, in which "capital from new investors [was used] to pay redemption proceeds to investor creditors seeking to exit the Bayou Hedge Funds."  (Id.)  Debtors further allege that the redeeming investors "knew or should have known that the Bayou Entities were fraudulent and insolvent, and that the redemption payments were made in furtherance of a fraud." (Id. ¶ 27)  In this regard, Debtors claim that the redeeming investors were "tipped" by their investment advisors to redeem, and that there were "a number of red flags that did or should have put [them] on actual or inquiry notice of the . . . fraud or insolvency" of the Bayou Funds.  (Id.)

### 1.    The Bankruptcy Court's Denial of <u>Appellants' Motions to Dismiss</u>

Appellants moved to dismiss the amended complaints, arguing that Debtors had failed to allege (1) actual intent to defraud with sufficient particularity; and (2) the absence of good faith on Appellants' part in redeeming their Bayou investments. Bayou I, 362 B.R. at 624.  As to the latter argument, the Bankruptcy Court held that Debtors need not plead the absence of good faith, because it is an affirmative defense under Section 548(c).  Id. at 638-39.  As to actual intent to defraud, the court held that the allegations in the amended complaints had been pleaded with sufficient particularity.

---

[7]  Of the 120 adversary proceedings that were filed, all but the eight presently before this Court have been settled.  (Bayou Br. 2)

[8]  The complaints differ only in their description of the investment and redemption amounts of each redeeming investor defendant.

Under Section 548(a)(1)(A), transfers can be avoided as fraudulent conveyances where the transferor made the transfers with actual intent to "hinder, delay, and defraud" creditors. In a Ponzi scheme scenario, a presumption of actual intent to "hinder, delay, and defraud" exists. The Bankruptcy Court found that the amended complaints' allegations concerning the Bayou Funds – i.e., "that redemption payments of wholly-or partially-non-existent investment account balances and wholly-fictitious profits, as reflected on fraudulent financial statements, were made to earlier investors requesting redemption using funds invested by subsequent investors" – fell well within the case law's description of a Ponzi scheme. Id. at 633-34. Accordingly, the Bankruptcy Court found that Debtors had adequately pleaded "actual intent" to hinder, delay and defraud.

In denying the motions to dismiss, the Bankruptcy Court also rejected Appellants' argument that the Second Circuit's decision in Sharp Int'l Corp. v. State Street Bank & Trust Co., 403 F.3d 43 (2d Cir. 2005), precluded Debtors' intentional fraudulent conveyance claims. The Bankruptcy Court found Sharp – which involved Sharp's repayment of a legitimate loan from State Street, when Sharp's management was looting the company and State Street suspected fraud – inapposite:

> In contrast to the lawful and disclosed payment of a valid contractual antecedent debt in Sharp, the redemption payments at issue here of non-existent investor account balances as misrepresented in the fraudulent financial statements were themselves inherently fraudulent and constituted an integral and essential component of the fraudulent Ponzi scheme alleged in the amended complaints. The payments alleged here of fictitious account balances and profits were inherently deceitful and unlawful and were necessarily made with intent to "hinder, delay or defraud" present and future creditors. No such allegation was made in Sharp, which involved only a disclosed repayment of a valid antecedent debt actually owed to State Street.

Id. at 638.  The District Court denied leave to appeal on July 11, 2007.  (Pltf. Ex. 1)

### 2.    The Bankruptcy Court's Denial of Appellants' Motions for Summary Judgment on Standing Grounds

Appellants subsequently moved for summary judgment on Debtors' fraudulent conveyance claims, arguing that the non-redeeming investors lacked standing to bring these actions.  Appellants argued that the non-redeeming investors were not creditors but merely equity holders under the Bankruptcy Code, and that their claims were, in any case, disallowed under Section 510(b) of the Bankruptcy Code.  Bayou II, 372 B.R. at 664.

The Bankruptcy Court denied Appellants' motions on August 9, 2007, holding that the non-redeeming investors were not mere equity holders but were creditors by virtue of their tort claims against the Bayou Funds for rescission and damages.  Id. at 665.  The court further held that Section 510(b) speaks only of priority in distribution and "does not deal with allowance or disallowance of claims."  Id. at 666. Accordingly, while non-redeemers' claims would be "subordinated to any creditor interest which has a higher priority under the Bankruptcy Code than that of the underlying stock or equity interest," such claims are not disallowed under Section 510(b). Id.

### 3.    The Bankruptcy Court's October 16, 2008 Decision Granting Summary Judgment to Bayou

On January 18, 2008, Debtors moved for summary judgment arguing, inter alia, that Appellants' affirmative defense of good faith to Debtors' actual fraudulent conveyance claim failed as a matter of law.  Appellants filed cross-motions for summary judgment.  On October 16, 2008, the Bankruptcy Court issued an opinion holding, inter alia, that:  (1) Debtors had established a prima facie case of actual fraudulent conveyance

11

under Section 548(a)(1)(A) of the Bankruptcy Code by offering proof that each

redemption payment was made by the Debtors with "actual intent to hinder, delay or

defraud" the Bayou Funds' investors, <u>Bayou III</u>, 396 B.R. at 842-43; (2) an expert report

offered by Debtors (the "Lenhart Report") was admissible and established that the Bayou

Hedge Funds were insolvent when the redemption payments to Appellants were made, <u>id.</u>

at 834, 836; and (3) Debtors had established a <u>prima facie</u> case of constructive fraudulent

conveyance under Section 548(a)(1)(B) of the Bankruptcy Code, because the Bayou

Funds were insolvent at the time the redemption payments were made and Appellants –

having received fictitious profits in addition to their invested principal – had not given

"reasonably equivalent value" for their redemptions; and (4) Appellants' affirmative

defense of good faith to Debtors' actual fraudulent conveyance claim failed as a matter of

law, because Appellants were on inquiry notice as a result of information suggesting

"some potential infirmity in the investment" or "some infirmity [in the] integrity of its

management," and they had not diligently investigated these issues.  <u>Id.</u> at 865-79.

Accordingly, the Bankruptcy Court granted Debtors summary judgment on their claims

for actual and constructive fraudulent conveyance.

> ### E.    <u>Issues on Appeal</u>

In nearly 250 pages of briefing, Appellants argue that the Bankruptcy

Court committed a host of errors.  As an initial matter, Appellants repeat their arguments

that Debtors may not bring fraudulent conveyance claims on behalf of non-redeeming

investors, because these investors are equity holders and not creditors under the

Bankruptcy Code.  (Sonn. Br. 47-60)  Appellants also contend that the Bankruptcy Court

should have dismissed Debtors' claims for actual fraudulent conveyance under <u>Sharp</u>

<u>Int'l Corp. v. State Street Bank and Trust Co.</u>, 403 F.3d 43 (2d Cir. 2005), because they

were bona fide creditors who took their redemption payments in satisfaction of a pre-existing debt, just as the defendant in <u>Sharp</u> took payment to satisfy a legitimate pre-existing loan.  (CBHSE Br. 24; Sonn. Br. 32)

Appellants further argue that the Bankruptcy Court misapplied the law applicable to their good faith defense under Section 548(c) by (1) broadening the test for when a transferee is put on inquiry notice, and (2) ruling as a matter of law that Appellants had been put on inquiry notice and had not conducted a diligent investigation under Section 548(c).  (Sonn. Br. 39-40)

Appellants also contend that the Bankruptcy Court erred in admitting and in relying on the Lenhart Report to establish the insolvency of the Bayou Funds for purposes of Debtors' constructive fraudulent conveyance claim under Section 548(a)(1)(B) of the Bankruptcy Code.[9]  (Sonn. Br. 61-66; Freestone Br. 40)

---

[9]  Although Debtors originally brought claims under both federal bankruptcy law and Sections 273-76 of New York's Debtor and Creditor Law, the Bankruptcy Court did not separately address Debtors' state law claims, which sought "relief that [was] duplicative and co-extensive of the relief" sought under the Bankruptcy Code.  In its January 28, 2009 orders, the Bankruptcy Court dismissed Appellants' state law claims without prejudice.  (09 Civ. 2313 (S.D.N.Y), Docket No. 1 (Redwood Growth Partners, L.P. Final Judg.); 09 Civ. 2340 (S.D.N.Y.), Docket No. 1 (D. Canale Beverages, Inc. Final Judg.); 09 Civ. 2343 (S.D.N.Y.), Docket No. 1 (Heritage Hedged Equity Fund LP Final Judg.); 09 Civ. 2345 (S.D.N.Y.), Docket No. 1 (John D. Canale III Final Judg.); 09 Civ. 2347(S.D.N.Y.), Docket No. 1 (Mary P. Smythe Residuary Trust Final Judg.); 09 Civ. 2351(S.D.N.Y.), Docket No. 1 (Marvin E. Bruce Living Trust Final Judg.); 09 Civ. 2353 (S.D.N.Y.), Docket No. 1 (Freestone Final Judg.); 09 Civ. 2577(S.D.N.Y.), Docket No. 1 (CBHSE Final Judg.))

## DISCUSSION

## I.    STANDARD OF REVIEW

Under Rule 8013 of the Federal Rules of Bankruptcy Procedure, this Court "may affirm, modify, or reverse [the] bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.  District courts review Bankruptcy Court summary judgment decisions de novo.  Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 7 (S.D.N.Y. 2007) ("In re Manhattan Inv. Fund III")(citing cases).  In conducting such a review, the Court "decide[s] the issue[s] as if no decision had previously been rendered."  H&C Dev. Group, Inc. v. Miner (In re Miner), 229 B.R. 561, 565 (2d Cir. 1999).  "A bankruptcy judge's findings of fact[, however,] stand unless found by the district court to be clearly erroneous."  Shimer v. Fugazy Express (In re Fugazy Express), 124 B.R. 426, 430 (S.D.N.Y. 1991) (citing In re Skinner, 917 F.2d 444 (10th Cir. 1990)).  Moreover, this Court will review only those facts and legal arguments presented to the Bankruptcy Court.  See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 166 (2d Cir. 2003); Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc. (In re Warnaco Group, Inc.), No. 03 Civ. 4201 (DAB), 2006 U.S. Dist. LEXIS 4263, at *16 (S.D.N.Y. Feb. 2, 2006) (citing Invex, Ltd. v. Cassirer (In re Schick), No. 97 Civ. 9300 (JGK), 1998 WL 397849, at * 7 (S.D.N.Y. July 16, 1998); In re REA Holding Corp., 2 B.R. 733, 737 (S.D.N.Y. 1980)(argument not raised in bankruptcy court not properly before the district court on appeal)).

Federal Rule of Civil Procedure 56 is applicable to these proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056.  Under Rule 56, summary judgment is appropriate only when the "pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Whether facts are material is a determination made by looking to substantive law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The movant's burden will

be satisfied if he can point to an absence of evidence to support an essential element of

the nonmoving party's claim."  Goenaga v. March of Dimes Birth Defects Found., 51

F.3d 14, 18 (2d Cir. 1995).

      "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's

favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a

summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual

inferences that could rationally be drawn, in favor of the party opposing summary

judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  However, "a party

may not 'rely on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment.'"  Lipton v. Nature Co., 71 F.3d 464, 469 (2d

Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).

## II.  DEBTORS HAVE STANDING TO CHALLENGE THE PRE-PETITION TRANSFERS

      The Sonnenschein Appellants argue that the Bankruptcy Court erred in

holding that Debtors have standing to avoid and recover the Bayou Funds' pre-petition

transfers to Appellants.  (Sonn. Br. 47-60)  Under Section 550 of the Bankruptcy Code,

"to the extent that a transfer is avoided under section . . . 548 . . . the trustee may recover,

for the benefit of the estate, the property transferred. . . ."  11 U.S.C. § 550.  The Debtors'

standing is derived from that of non-redeeming investors by way of their creditor status,

see 11 U.S.C. §§ 544, 548, but Appellants argue that the non-redeeming investors' "status primarily as equity holders deprived the Debtors of standing and the authority to sue on their behalf." (Sonn. Br. 47) This argument has no merit.

The non-redeeming investors on whose behalf these actions were commenced are creditors by virtue of their tort claims for fraudulent inducement, rescission and damages against the Bayou Funds. Because the non-redeeming investors were "fraudulently induced to purchase their investments in the Funds by the fraudulent financial statements certified by the non-existent accounting firm," there is no dispute that the non-redeeming investors "'had the right prior to the filing of the petition to pursue claims for damages or rescission against the Bayou Hedge Funds.'" Bayou II, 372 B.R. at 665 (quoting defendants' brief below (citing cases holding that defrauded investors are tort creditors)). Ample case law demonstrates that valid tort claims create creditor status at the moment the tort claims accrue. For example, in Drenis v. Haligiannis, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006), the court found that limited partners with equity interests in a partnership were also creditors under the New York DCL because "of their [tort] claims against the defrauding defendants": "Under New York's broad definition of 'creditor,' one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer is a creditor and 'it is now accepted that the relationship of debtor and creditor [in tort cases] arises the moment the cause of action accrues.'"[10] Drenis, 452 F. Supp. 2d at 428 (internal citations omitted)

---

[10] The law is the same in other jurisdictions. Dillon v. Axxsys Int'l, Inc., 185 Fed. Appx. 823, 830 (11th Cir. 2006) (shareholders who were fraudulently induced to invest "clearly became 'creditors'" under Florida's Fraudulent Transfer Act); Scholes v. Lehman, 56 F.3d 750, 754 (7th Cir. 1995) (defrauded limited partners were "creditors" under Illinois

Appellants concede that the non-redeemers have legitimate tort claims against the Funds (Sonn. Br. 37 ("each defrauded investor was a creditor to the extent the investor was entitled to rescind his or her investments and demand return of all invested monies or seek damages"); id. at 47 ("as everyone concedes, [non-redeeming investors] had the right prior to the filing of the petitions to pursue claims for damages or rescission"); id. at 58 ("It is undisputed that the investors had the right to pursue legal remedies, including for fraudulent misrepresentation, inducement and/or retention against the Bayou Hedge Funds.")), but contend that under the Bankruptcy Code, the non-redeemers cannot be both equity holders and creditors.  The fact that an investor holds an equity interest, however, does not mean that that investor is not also a creditor.  IDS Holding Co., LLC v. Madsen (In re IDS Holding Co., LLC), 292 B.R. 233, 238 (Bankr. D. Conn. 2003) (cases "providing that shareholders are equity security holders, not claim holders. . . . do not imply that a shareholder cannot also have a claim against the company in addition to being an equity security holder.  'There is no provision in the Bankruptcy Code that a limited partner with an equity security interest cannot also have an independent claim within the definition of 101(4) arising out of the same instrument.'") (quoting In re St. Charles Pres. Investors, Ltd., 112 B.R. 469, 474 (D.D.C. 1990) (stating

---

fraudulent transfer statute because they were "tort creditors of the corporations from which they had been inveigled into buying limited-partner interests"); Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 857 n. 24 (D. Utah 1987) (Ponzi scheme investors "had a claim against the debtors for the return of [their] money"; "[i]f there was a valid contract that gave the defendant an equity interest in the debtors' business, as the trustee contends, the defendant would still have had a right to restitution if the debtors' fraud induced him to enter into the contract. See Restatement (Second) of Contracts §§ 164 & 376 (1979).").

that "the definitions of 'creditor' and 'equity security holder' are [not] mutually

exclusive")).  Appellants cite no law to the contrary.[11]

Appellants argue, however, that the non-redeemers' tort claims will be

subordinated under Section 510(b) of the Bankruptcy Code, and that as a result, the non-

redeemers will be stripped of their status as creditors.  Section 510(b) provides:

> <u>For the purpose of distribution</u> under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 [11 USCS § 502] on account of such a claim, <u>shall be subordinated to all claims or interests that are senior to or equal the claim</u> or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

Appellants argue that "[t]he first clear, direct effect of subordination to the

level of equity holder in an insolvent estate is disallowance of the claim – not distribution

---

[11]  The Sonnenschein Appellants misleadingly argue that the Bankruptcy Court ruled in <u>Bayou I</u> that they – as investors in the Funds – were equity holders, and then reversed course in <u>Bayou II</u>, finding that the non-redeemers were creditors:

> For purpose of denying the motion to dismiss based upon the application of the <u>Sharp</u> decision, the Bankruptcy Court treated the Sonnenschein Investors as equity holders receiving payment on their overstated equity accounts rather than on account of a legitimate debt.  <u>Bayou I</u>, 362 B.R. at 368.  The Bankruptcy Court took the opposite position when the Sonnenschein Investors moved for summary judgment on the grounds that Bayou Hedge Funds lacked standing to pursue the litigation as . . . the non-redeeming investors who had filed claims against the Bayou Hedge Funds were equity holders [and the] fraudulent conveyance statutes are exclusively creditor remedies. . . . Then, the Bankruptcy Court denied the motion holding that the investors in the Bayou Hedge Funds were legitimate creditors of the funds with both contract and tort claims.

(Sonn. Br. 5; <u>see</u> <u>also</u> <u>id.</u> Br. 36, 47)  Appellants' argument rests on the assumption – rejected above – that equity holders cannot also be creditors.

or recovery."  (Sonn. Br. 58)  As the Bankruptcy Court noted in rejecting this "sweeping"

argument, however, it is "utterly without foundation."  Bayou II, 372 B.R. at 666.  The

initial clause of Section 510(b) – "for the purpose of distribution" – betrays this

provision's meaning and application.  While Appellants cite cases (Sonn. Br. 58-60) that

generally discuss priority in asset distribution – and make the unremarkable point that

equity holders frequently receive no distribution from an insolvent estate – none of these

cases suggest that subordination under Section 510(b) affects the standing of a creditor to

assert claims in the first place.[12]  Neither Section 510(b) nor the case law applying it

suggests that subordination of a creditor's claim converts that claim to an equity interest

or results in automatic disallowance of that claim.  Section 510(b) "does not operate to

reduce or eliminate [claims], but only to ensure that [claimants] receive compensation for

their claim on the same basis as the claimants who are on the level to which their claim is

subordinated."  Kaiser Group Int'l, Inc. v. Pippin (In re Kaiser Group Int'l, Inc.), 326

B.R. 265, 268 (D. Del. 2005); see also 5 Collier on Bankruptcy ¶ 510.02[2] (15th ed.

2008) ("A creditor whose claim has been subordinated does not cease to be a creditor

_____

[12]  The cases Appellants rely on (Sonn. Br. 58-59) – Carrieri v. Jobs.com Inc., 393 F.3d
508, 528 (5th Cir. 2004); In re Geneva Steel Co., 281 F.3d 1173 (10th Cir. 2002);
Shackleford v. Metricom, Inc., No. 05 Civ. 1995 (JF), 2006 WL 2724149 (N.D. Cal.
Sept. 22, 2006); In re WorldCom, Inc., 329 B.R. 10, 11-12 (Bankr.S.D.N.Y. 2005); In re
Enron Corp., 352 B.R. 363, 366 (Bankr. S.D.N.Y. 2006); and In re Walnut Equipment
Leasing Co., Inc., No. 97-19699-DWS, 1999 WL 1271762 (Bankr. E.D. Pa. Dec. 28,
1999) – all involve tort or contract claims that were subordinated under Section 510(b) to
the level of equity.  As a result, the claimants in those cases received no distribution
under the debtor's plan, because equity holders as a whole received no distribution.
While a tort claimant whose claim has been subordinated to equity will often receive
nothing under a reorganization or liquidation plan – the estate having been consumed to
pay more senior claims – as discussed above, that does not mean that these claimants are
not creditors.  It simply means that their claims are inferior for purposes of priority of
distribution under Section 510(b).

under the Code [and] continues to enjoy all of the rights of a creditor except to share in the distribution of the estate on parity with the other creditors.").[13]

While, as the Bankruptcy Court noted, "subordination of a tort claim under Section 510(b) to the level of equity may be said to have the same practical effect as disallowance . . . where there is no value left over [after more senior claims have been paid under the debtor's reorganization or liquidation plan],"[14] Bayou II, 372 B.R. at 667, that result does not mean that tort creditors do not have standing to assert a claim. Priority in distribution is irrelevant to standing. Appellants are creditors regardless of how low on the totem pole their claims fall.

---

[13] To the extent that In re Revco D.S., Inc., 118 B.R. 468, 474 (Bankr. N.D. Ohio 1990) is to the contrary, this Court declines to follow it. In Revco, the court considered the claims of an investor that had purchased preferred stock. The court noted that "[g]enerally, the rights of shareholders to redeem stock are not guaranteed but are dependent on the financial solvency of the corporation. Accordingly, the mandatory redemption provision of convertible preferred stock is an interest and not a claim. . . ." Id. (citing In re St. Charles Pres. Investors, Ltd., 112 B.R. at 469). The court went on to reject "New York Life's argument that it is a subordinated creditor of both Anac and Revco by reason of its claims for fraud in connection with the purchase of the Preferred Stock." Id. The court – without explanation or any supporting citation – stated that this argument was "unfounded and will not confer 'creditor' status on New York Life. Pursuant to 11 U.S.C. § 510(b) any claim of New York Life regarding the purchase of its Preferred Stock would not rise above the level of an equity interest of the Preferred Stock." Id. at 474-75. The court then held that the investor was "not a 'creditor' of Revco or Anac, but rather an equity holder and therefore has no standing to prosecute a state fraudulent conveyance action. Ohio Rev.Code §§ 1336.01-.12." Id. at 475.

To the extent that the Revco court relied on Ohio law for its standing determination, that determination is not persuasive here. To the extent Revco stands for the proposition that Section 510(b) strips an equity holder with a tort claim of standing to pursue that claim, and deprives that investor of status as a "creditor," this Court rejects that holding, having concluded that Section 510(b) merely determines the priority of distribution that a claim will receive.

[14] Here, Debtors had no material trade or borrowing debt. Accordingly, the creditors of the Debtors' estates consist primarily of the non-redeemers. Bayou III, 396 B.R. at 831.

III.     *IN RE SHARP* **DOES NOT CONTROL THE INSTANT APPEALS**

Appellants contend that in Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43 (2d Cir. 2005), the Second Circuit "stated unequivocally that the fraudulent conveyance laws . . . are inapplicable to those conveyances which constitute 'the repayment of an antecedent debt.'"  (CBHSE Br. 24 (quoting In re Sharp Int'l Corp., 403 F.3d at 54); see also Sonn. Br. 32)  Appellants further contend that the redemption payments they obtained satisfied a legitimate, pre-existing debt the Bayou Funds owed to them as creditors, and that accordingly "the transfers here are outside the purview of the fraudulent conveyance laws."  (CBHSE Br. 29; see also Sonn. Br. 31-39)  Because an understanding of the facts and the legal issues presented in Sharp is critical in considering its applicability here, they are discussed in detail below.

In Sharp, debtor Sharp International brought intentional and constructive fraudulent conveyance claims under New York's DCL against its lender, State Street Bank.  Sharp's controlling shareholders – the Spitz brothers – had falsified sales, inventory and accounts receivable data in order to report fictitious revenue in Sharp's financial records.  They then used these fraudulent records to obtain loans from banks and other lenders, including a $20 million line of credit from State Street.  Between 1997 and October 1999, the Spitzes looted the fraudulently raised funds as well as Sharp's corporate profits.  In re Sharp Int'l Corp., 403 F.3d at 46.

In the summer of 1998, State Street began to suspect fraud, based in large part on Sharp's refusal to comply with certain accounting obligations required by the Sharp/State Street loan agreement, Sharp's purportedly rapid growth, and its "voracious consumption of cash."  In October 1998, State Street sought information from Sharp

about its largest customers and requested the 1998 work papers of Sharp's outside auditor.  The following month, State Street requested a detailed statement listing accounts receivable and cash receipts, and asked Sharp for formal confirmations of the company's accounts receivable (both of which the Spitzes refused to provide).  State Street also reviewed activity in Sharp's "demand and deposit" account at State Street "to see if any substantial payments had been made to the Spitzes."  On November 18, 1998, State Street received Dun & Bradstreet reports concerning eighteen of Sharp's purported customers. The reports indicated that a number of these alleged customers were not doing business with Sharp.  Id. at 47.

Based on this investigation, State Street demanded that Sharp, by March 31, 1999, obtain new financing and use these funds to pay off the amount Sharp had drawn down on its State Street line of credit.  Sharp agreed, raised $25 million from unsuspecting investors, and used $12.25 million to pay off the State Street debt.  During this period, State Street did not share its concerns about Sharp with anyone, ignored calls from Sharp's noteholders, chose not to exercise its right to foreclose on Sharp's line of credit, and consented to the Company's new indebtedness.  Id. at 48.

In July 1999, Sharp's auditor refused to issue a 1999 audit opinion on Sharp and withdrew its 1997 and 1998 audit opinions.  In September, Sharp was forced into bankruptcy, and in November 2000, the bankruptcy court entered a $44 million judgment against the Spitzes, who later pleaded guilty to fraud.  The judgment remained unsatisfied.  Id. at 48.

On May 30, 2001, Sharp brought an adversary proceeding against State Street in bankruptcy court, seeking as damages the amount the Spitzes stole after State

22

Street's alleged discovery of the fraud, as well as the $12.25 million payment State Street received following the new financing.  State Street moved to dismiss, arguing, inter alia, that Sharp had failed to state a claim for intentional or constructive fraudulent conveyance.  The bankruptcy court dismissed Sharp's complaint, and the district court and the Second Circuit affirmed.  Id.

As to intentional (or actual) fraudulent conveyance, Sharp sheds little light on the issues raised in this case.  In particular, Sharp does not address the Section 548(c) good faith affirmative defense raised by Appellants.  Sharp deals exclusively with provisions of New York's DCL; Section 548(c) was not at issue.  Moreover, in affirming the dismissal of the actual fraudulent conveyance claim under DCL § 276, the Circuit acknowledged that where "'actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.'"  Id. at 56 (quoting United States v. McCombs, 30 F.3d 310, 328 (2d Cir. 1994)).  Sharp works no change in the law as to actual fraudulent conveyance, and turns on a straightforward pleading issue.

The Second Circuit affirmed the dismissal of Sharp's actual fraudulent conveyance claim because "Sharp inadequately alleges fraud with respect to the transaction that Sharp seeks to void, i.e., Sharp's $12.25 million payment to State Street."  Id. at 56.  The Circuit noted that the fraud Sharp pleaded in the complaint

> relates to the manner in which Sharp obtained new funding from Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street.  The $12.25 million payment was at most a preference between creditors and did not "hinder, delay, or defraud either present or future creditors."  DCL § 276. . . .

Id.

Here, the circumstances of Debtors' actual fraudulent conveyance claim could not be more different.  The Amended Complaint pleaded, and the Bankruptcy

Court found as a matter of law, that the redemption payments at issue were made "[t]o avoid detection of the fraud, to retain existing investors and to lure new investors," and constituted "an integral and essential element of the alleged fraud, necessary to validate the false financials and to avoid disclosure." Bayou II, 372 B.R. at 663;  (see also Am Cmplt. ¶¶ 13-14)  Because Sharp's complaint failed to plead that the loan repayment was made to "hinder, delay or defraud" Sharp's creditors  – and instead focused on "the manner in which Sharp obtained new funding" – Sharp failed to make out a prima facie case of actual fraudulent conveyance.[15]  In re Sharp Int'l Corp., 403 F.3d at 56.  The Debtors here, however, specifically pled and demonstrated that the redemption payments hindered, delayed, and defrauded Bayou's creditors, by inter alia, forestalling disclosure of the fraudulent scheme.[16]  Accordingly, Sharp provides no basis for dismissing Debtors' actual fraudulent conveyance claim.

As to Sharp's constructive fraudulent conveyance claim under DCL §§ 272-75, the Second Circuit's decision focuses on whether Sharp had adequately alleged a

---

[15]  As the Second Circuit noted, Sharp had not alleged that "State Street offered its silence as an inducement [for the repayment of the loan]."  Instead, Sharp's complaint alleged that "'State Street elected not to confront the Spitzes with what it knew'" but to simply request repayment, "a demand that was consistent with State Street's contractual and legal rights." Sharp, 403 F.3d at 51.

[16]  As the Bankruptcy Court stated,

> [t]he contrast [between the repayment of the State Street loan and] the redemption payments at issue in these adversary proceedings is stark and crystallizes the fundamental difference between Sharp and the Section 548(a)(1)(A) claims here. In contrast to the lawful and disclosed payment of a valid contractual antecedent debt in Sharp, the redemption payments at issue here of non-existent investor account balances as misrepresented in fraudulent financial statements were themselves inherently fraudulent and constituted an integral and essential component of the [fraud scheme].

Bayou I, 362 B.R. at 638.

lack of "fair consideration" and "good faith" under New York law.  In rejecting Sharp's

argument that its constructive fraudulent conveyance claim should survive – because

State Street knew of the Spitzes' fraud and Sharp was insolvent when it repaid the loan –

the Second Circuit stated that "bad faith does not appear to be an articulable exception to

the broad principle that the 'satisfaction of a preexisting debt qualifies as fair

consideration for a transfer of property.'"  Id. at 54 (quoting Pashaian v. Eccelston Props.,

88 F.3d 77, 85 (2d Cir. 1996) (interpreting New York law)).  Appellants improperly cite

language from this section of Sharp – which has nothing to do with actual fraudulent

conveyance under the Bankruptcy Code or with Appellants' good faith affirmative

defense under Section 548(c) – to support their argument that "payments to creditors

which satisfy preexisting debt are outside the purview of the fraudulent conveyance laws

even if 'inherently fraudulent.'" (CBHSE Br. 28)  Nothing in the Sharp decision indicates

that the Court made any such pronouncement as to actual fraudulent conveyance under

Section 548.  Sharp addresses only the debtor's claims under the New York DCL.

> DCL § 272 – the central provision at issue in Sharp – provides that
>
> [f]air consideration is given for property . . . [w]hen in exchange for such
> property . . . as a fair equivalent therefor, and in good faith, property is
> conveyed or an antecedent debt is satisfied. . . .

DCL § 272.  The Second Circuit concluded that Sharp had "fail[ed] adequately to allege a

lack of 'fair consideration,'" because it had not pleaded facts demonstrating that State

Street had acted in bad faith.  More specifically, the Second Circuit held that "State

Street's knowledge of the Spitzes' fraud, without more, does not allow an inference that

State Street received the $12.25 million payment in bad faith."  Sharp, 403 F.3d at 53, 56.

While there are similarities between Section 548 of the Bankruptcy Code – the statute at issue here – and the New York State fraudulent conveyance statutes at issue in Sharp, there are, as the Second Circuit has recognized, important differences:

> Unlike the Bankruptcy Code, [New York's Uniform Fraudulent Conveyance Act, DCL, §§ 270-281] is a set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property.  Thus, [DCL §§ 270-281] does not bestow a broad power to reorder creditor claims or to invalidate transfers that were made for fair consideration, at least where no actual intent to hinder, delay, or defraud creditors has been shown.

HBE Leasing Corp. v. Frank, 48 F.3d 623, 643 (2d Cir. 1995) (citing Boston Trading Group v. Bunnazos, 835 F.2d 1504, 1508 (1st Cir. 1988)).

Perhaps in recognition of their somewhat different purposes – protecting creditors versus distributing a bankrupt estate equitably – the two statutes differ as to pleading and burdens of proof:

> Under New York law, the party seeking to have the transfer set aside has the burden of proof on the element of fair consideration and, since it is essential to a finding of fair consideration, good faith.  United States v. McCombs, 30 F.3d 310, 326 & n.1 (2d Cir. 1994).  The Bankruptcy Code also provides that good faith is relevant in a constructive fraud case, but unlike New York law, § 548(c) of the Bankruptcy Code "designates the transferee's good faith as an affirmative defense which may be raised and proved by the transferee at trial," and the plaintiff need not plead lack of good faith as an element of the claim itself.  Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund, Ltd.), 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002) [("In re Manhattan Inv. Fund I")].

Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.), 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005).

Accordingly, in Sharp, the debtor – in order to establish a claim for constructive fraudulent conveyance under New York law – had the burden of pleading and proving that State Street had received the loan repayment in bad faith.  Here, Bayou

was not obligated to plead and prove that Appellants had received their redemption

payments in bad faith.  Instead, Appellants had the obligation under Section 548(c) to

prove their good faith as an affirmative defense.  Id. at 54-55.

Given the somewhat different purposes and different legal standards

applicable under Section 548 and the DCL, it is not appropriate for this Court to assume

that Sharp's statements addressing "fair consideration" – a term that does not appear in

the Bankruptcy Code – and lack of good faith under DCL § 272 apply with equal force to

Section 548.[17]  See Jobin v. McKay, 84 F.3d 1330, 1338 (10th Cir. 1996) (rejecting

argument that "definitions of good faith . . . under state fraudulent conveyance laws

should be adopted in interpreting § 548(c).  Many of these provisions contain language

different than the language used in § 548(c) and . . . involve policy concerns not

applicable here.")  Accordingly, the Bankruptcy Court did not err in holding that Sharp

does not control resolution of Bayou's fraudulent conveyance claims.

## IV.    THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT DEBTORS MADE OUT A PRIMA FACIE CASE OF ACTUAL FRAUDULENT CONVEYANCE

Under the Bankruptcy Code, a debtor may avoid certain transfers made

prior to the initiation of bankruptcy proceedings and obtain an order returning these funds

to the estate for the benefit of the debtor's creditors.  See In re Manhattan Inv. Fund III,

397 B.R. at 7.  A transfer that constitutes an actual or intentional fraudulent conveyance

under Section 548(a)(1)(A) may be avoided in its entirety – as to both invested principal

and profits – whether or not the debtor received value in exchange for the transfer.  See

---

[17]  Boston Trading Group, Inc. v. Burnazos, 835 F.2d 1504 (1st Cir. 1987) – which relies on a Massachusetts statute identical to DCL § 272 – is inapposite for the same reasons.

11 U.S.C. 548(a)(1)(A); <u>Bayou I</u>, 362 B.R. at 629-30 (citing <u>Jobin</u>, 84 F.3d at 1334;

<u>Terry v. June</u>, 432 F. Supp. 2d 635, 642 (W.D.Va. 2006); Mark A. McDermott, <u>Ponzi</u>

<u>Schemes and the Law of Fraudulent and Preferential Transfers</u>, 72 AM. BANKR. L.J. 157,

173 (1998)).

> Section 548(a)(1) provides:
>
> The trustee may avoid <u>any</u> transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
>
> (A)      made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. . . .

11 U.S.C. § 548(a)(1)(A) (emphasis added).

Actual fraudulent conveyance claims under Section 548(a)(1)(A) turn on

the intent of the debtor in making the transfer; the state of mind of the transferee is

irrelevant.  <u>Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew</u>

<u>Velez Constr., Inc.)</u>, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007) (dismissing complaint

alleging actual fraudulent conveyance because it contained "no allegations whatsoever of

the Debtor's own intent to hinder, delay or defraud its creditors"); <u>Nissdson v. Softbank</u>

<u>AM Corp. (In re Marketxt Holdings Corp.)</u>, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007)

("Under the Bankruptcy Code, the plaintiff must establish the actual fraudulent intent of

the transferor/debtor. . . ."); <u>In re Actrade Fin. Techs., Ltd.</u>, 337 B.R. at 808 ("Cases

under § 548(a)(1)(A) indicate that it is the intent of the transferor/[debtor] and not the

transferee that is relevant for purposes of pleading a claim for intentional fraudulent

conveyance under the Bankruptcy Code." (citing cases)).  This intent "to hinder, delay, or

defraud" creditors need not target any particular entity or individual as long as the intent

28

is generally directed toward present or future creditors of the debtor.  See 5 Collier on Bankruptcy ¶ 548.04[1] (15th ed. rev. 2006).  Moreover, only the intent to hinder, delay or defraud need be shown; success in this regard need not be demonstrated for a transfer to constitute an actual fraudulent conveyance.  See id.

While "the issue of fraudulent intent [often] cannot be resolved on a motion for summary judgment, [because there is] a factual question involving the parties' states of mind," Golden Budha Corp. v. Can. Land Co. of Am., 931 F.2d 196, 201-02 (2d Cir. 1991) (citing Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 711 (2d Cir. 1991)), "[a]ctual [fraudulent] intent . . . may . . . be established as a matter of law in cases in which the debtor runs a Ponzi scheme or a similar illegitimate enterprise, because transfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors."  Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.), 359 B.R. 510, 517-18 (Bankr. S.D.N.Y. 2007) ("In re Manhattan Inv. Fund II") (citing Rieser v. Hayslip (In re Canyon Sys. Corp.), 343 B.R. 615, 637 (Bankr. S.D. Ohio 2006) ("[C]ourts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud." (citing cases))).

Here, in concluding that the Debtors had established a prima facie case of actual fraudulent conveyance – that is, that the Bayou Funds had demonstrated that the redemption payments to Appellants were made with the requisite "actual intent to hinder, delay, or defraud" creditors – the Bankruptcy Court relied on the guilty pleas of the Bayou principals and an expert report demonstrating that "the redemption payments corresponded precisely to the fraudulently inflated account statements for the redeeming

investors."[18]   Bayou III, 396 B.R. at 843.  The Bankruptcy Court found that the

redemption payments – which reflected far more than the true value of redeemers'

accounts – were a critical component of Israel and Marino's fraudulent scheme, and were

made with the actual intent to hinder, delay or defraud creditors:

> Since Israel and Marino confessedly knew that the investor account statements were inflated, why would they authorize redemption payments they knew exceeded the redeeming investors' contractual entitlements, thereby exacerbating the insolvency and the damage to other investors? The answer is self-evident.  It was essential to honor every request for redemption in accordance with the investor's expectation based upon the investor's falsely inflated account statement, because failure to do so would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud. Consequently, every redemption payment in and of itself constituted an intentional misrepresentation of fact with respect to the redeeming investor's redemption rights based on the investor's falsely inflated account statement.  Redemption payments consistent with the fraudulent investor account statements were an integral and essential part of the Bayou fraud.

> The conclusion is inescapable that corrupt Bayou Management authorized the fraudulently inflated redemption payments with "actual intent to hinder, delay, or defraud" because there cannot be any other explanation for Israel and Marino to authorize redemption payments in amounts to which they knew the redeeming investors were not contractually entitled and which deepened the insolvency and damaged the remaining investors.

Id. at 843 (emphasis in original).

Of the Appellants, only Freestone contests the Bankruptcy Court's finding

of actual intent to defraud.  Freestone complains that the Bayou principals' guilty pleas

make no reference to the redemption payments or to their intent in making the

redemption payments, and that, in effect, the Bankruptcy Court applied "a Ponzi scheme

---

[18]  A bankruptcy court's finding of actual fraudulent intent is generally treated as a "factual finding . . . [subject to] revers[al] only upon a showing of clear error."  In re Sherman, 67 F.3d 1348, 1353 (8th Cir. 1995) (citing In re Acequia, Inc., 34 F.3d 800, 805 (9th Cir. 1994); McCormick v. Security State Bank, 822 F.2d 806, 808 (8th Cir. 1987)).

presumption when the Trustee did not argue [that] there was a Ponzi scheme and the

Court did not find a Ponzi scheme."[19]  (Freestone Br. 51).  Freestone does not contend,

however, that there is any evidence whatsoever rebutting or casting doubt on the

Bankruptcy Court's finding that the Bayou principals authorized the redemption

payments with actual intent to defraud Bayou's creditors.

   With respect to the content of the Bayou principals' guilty pleas, it is

apparent that their admissions were sufficiently broad to include the fraudulent

redemption payments.  The informations charged, and the Bayou principals admitted, that

they had disseminated "various kinds of documents containing false information about

Bayou's performance to current . . . clients of Bayou which made it appear that Bayou

was performing better than it truly was," and that their intent in doing so was to "induce[]

new investors to invest in Bayou and [to] lull[] existing investors into retaining their

investments in the Bayou Hedge Funds."  (Pltf. Ex. 3 at 15, 24; Pltf. Ex. 4 at 20; Pltf. Ex.

5 at 8)  The redemption payments fall well within this description, because they

---

[19]  As noted above, where a Ponzi scheme exists, there is a presumption that transfers
were made with the intent to hinder, delay and defraud creditors.  See, e.g., In re
Manhattan Inv. Fund III, 397 B.R. at 7 (a Ponzi scheme "demonstrates 'actual intent' as a
matter of law because 'transfers made in the course of a Ponzi scheme could have been
made for no purpose other than to hinder, delay or defraud creditors'" (quoting In re
Manhattan Inv. Fund II, 359 B.R. at 517-18 ("'Courts nationwide have recognized that
establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent
to defraud.'" (quoting In re Canyon Sys. Corp., 343 B.R. at 637 (citing cases))))); In re
AFI Holding, Inc., 525 F.3d 700, 704 (9th Cir. 2008) (existence of Ponzi scheme is
sufficient to establish actual intent to defraud under Section 548(a)(1)).

The logic for applying a presumption of actual intent to defraud in the Ponzi scheme
scenario is tied to the fact that a Ponzi scheme "cannot work forever."  When the pool of
investors runs dry – as it will – the operator knows that the scheme will collapse and that
those still invested in the enterprise will lose their money.  "Knowledge to a substantial
certainty constitutes intent in the eyes of the law," and awareness that some investors will
not be paid is sufficient to establish actual intent to defraud.  Martino v. Edison
Worldwide Capital (In re Randy), 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995).

constitute false representations of the true value of the investors' accounts and were

critically necessary to induce new investors to invest in Bayou and existing investors to

remain invested in the Funds.  Any report that Bayou had stopped honoring redemption

requests would have led to the rapid collapse of the Funds.

  With respect to the Ponzi scheme presumption – although the Bankruptcy

Court did not use this term or make such a finding in granting Debtors summary

judgment on the issue of actual fraudulent conveyance[20] – the Bankruptcy Court found

all of the essential elements of such a scheme, including principals who "'made up

numbers'" to disguise trading losses and self-dealing; insolvency; reports to investors

containing "falsely inflated earnings" that were designed to "deceitfully induc[e] present

investors to retain their accounts and prospective investors to invest"; redemption

payments that correlated with previously issued "falsely inflated account statement[s]"

that bore no relation to the account's true value, and thus involved the use of new

investors' money to pay off redeemers.  Bayou III, 396 B.R. at 842-43.

  According to the Second Circuit, "[a] 'Ponzi' or 'Pyramid' scheme is a

fraudulent investment scheme in which money contributed by later investors is used to

pay artificially high dividends to the original investors, creating an illusion of

profitability, thus attracting new investors."  Ades-Berg Investors v. Breeden (In re The

Bennett Funding Group, Inc.), 439 F.3d 155, 157 n.2 (2d Cir. 2006) (citing Black's Law

Dictionary 1198 (8th ed. 2004)); see also Hirsch v. Arthur Andersen & Co., 72 F.3d

1085, 1088 n.3 (2d Cir. 1995) ("A Ponzi scheme is a scheme whereby a corporation

---

[20]  In denying Appellants' motions to dismiss, the Bankruptcy Court found that the
Debtors' amended complaint pleaded a Ponzi scheme.  Bayou I, 362 B.R. at 633-34.

operates and continues to operate at a loss.  The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors."); <u>Jobin</u>, 84 F.3d at 1332 n.1 ("We have defined a Ponzi scheme as an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."); <u>Canning v. Bozek (In re Bullion Reserve of N. Am.)</u>, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988) ("A 'Ponzi' scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors.").  The facts as found by the Bankruptcy Court – which are supported by overwhelming evidence and which have not been contradicted in any fashion by Appellants – fit the Second Circuit's description of a Ponzi scheme.[21]  Accordingly, although the Ponzi scheme presumption was not applied by the Bankruptcy Court, it is fully applicable here.

Even if the Ponzi scheme presumption were not applicable, the guilty pleas of the Bayou principals combined with the Lenhart Report – which confirms the existence of the fraud scheme and "establishes that the redemption payments corresponded precisely to the fraudulently inflated account statements for the redeeming investors" – provides overwhelming evidence of actual fraudulent intent.  <u>Bayou III</u>, 396

---

[21]  Appellants argue that the Ponzi scheme presumption does not apply here, because the Bayou Funds did not promise their investors extraordinarily high returns.  (Sonn. Br. 35)  As the court in <u>In re Manhattan Inv. Fund III</u> pointed out in rejecting such an argument, however, "there is no precise definition of a Ponzi scheme and courts look for a general pattern, rather than specific requirements. . . . A key factor is that the Ponzi schemer requires – and secures – new investors to keep the sham arrangement afloat. . . . Another factor is that new monies are used to pay off earlier investors."  397 B.R. at 12.  Such was the case in <u>In re Manhattan Inv. Fund III</u>, and such is the case here.

B.R. at 842-43.  Moreover, the redemptions were accompanied by multiple "badges of fraud," including fraudulently inflated principal and profits and inadequate consideration. See In re Kaiser, 722 F.2d 1574, 1582 (2d Cir. 1983); Adelphia Recovery Trust v. Bank of Am., 624 F. Supp. 2d 292, 335 (S.D.N.Y. 2009).

        This evidence is more than sufficient to establish the Bayou principals' actual fraudulent intent in making the redemption payments to Appellants, and Appellants have not offered any evidence that creates a material issue of fact on this point.  See Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin), 525 F.3d 805, 814 (9th Cir. 2008) (citing Floyd v. Dunson (In re Ramirez Rodriguez), 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997) ("[T]he criminal conviction of Ms. Rodriguez based on the debtors' operation of a Ponzi scheme conclusively establishes fraudulent intent, and precludes the defendant from relitigating this issue."); Martino v. Edison Worldwide Capital (In re Randy), 189 B.R. 425, 439 (Bankr. N.D. Ill. 1995) (holding that debtor's actual intent to defraud investors was conclusively established by the jury verdict against him in a criminal proceeding); Emerson v. Maples (In re Mark Benskin & Co.), 161 B.R. 644, 648 (Bankr. W.D. Tenn. 1993) ("The debtors' intent to defraud creditors was established by the guilty pleas to the related criminal charges and preclusive effect may be given to those guilty pleas as factual findings to the extent that the debtors' intent to defraud creditors is required in this adversary proceeding."); Faulkner v. Kornman (In re Heritage Org., L.L.C.), 413 B.R. 438, 476 (Bankr. N.D. Tex. 2009) ("In In re Soza . . . the Fifth Circuit noted that 'the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors' can be relevant to a finding of

34

fraudulent intent.  Such a pattern of conduct is apparent here, giving rise to a further

inference of fraudulent intent." (quoting In re Soza, 542 F.3d 1060, 1067 (5th Cir.

2008))).

   In sum, the Bankruptcy Court committed no error in holding that Debtors

had made out a prima facie case of actual fraudulent conveyance.

## V. SECTION 548(c) GOOD FAITH DEFENSE

   The Bankruptcy Court rejected as a matter of law Appellants' Section

548(c) affirmative defense of good faith, holding that Appellants were on inquiry notice

as a result of information suggesting "some potential infirmity in the investment" or

"some infirmity in Bayou or the integrity of its management," and that they had not

diligently investigated the information suggesting that such infirmities existed.  Bayou

III, 396 B.R. at 848, 865-78, 880-82.  Appellants contend that the Bankruptcy Court's

decision must be reversed, because the Court's expanded scope for "inquiry notice"

"departs significantly from the . . . case law," and because the Court improperly

"abandoned the reasonable person benchmark" in determining whether Appellants had

conducted a "diligent investigation" of their concerns.  (Sonn. Br. 39-40)

### A. Legal Standard for the Good Faith Affirmative Defense

   After a debtor makes out a prima facie case of actual or constructive

fraudulent conveyance, a transferee nevertheless may avoid rescission of a transfer under

Section 548(c) of the Bankruptcy Code under the following circumstances:

> a transferee . . . of such a transfer . . . that takes for value and in good faith
> . . . may retain any interest transferred . . . to the extent that such transferee
> . . . gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. §548(c) (emphasis added).  A transferee bears the burden of proving that it

took:  (1) "for value . . . to the extent that [it] gave value" to the debtor in exchange for

such transfer and (2) "in good faith."  See Bayou III, 396 B.R. at 844; In re Actrade Fin. Techs., Ltd., 337 B.R. at 805 (citing Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.), 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999) ("[Section 548(c)] has been construed as an affirmative defense, all elements of which must be proven by the defendant-transferee.")).  Here, the "value" component of Section 548(c) is not in dispute:  Appellants gave value in the form of their initial investments, and have tort claims of rescission to recover all of their initial investment based on fraudulent inducement.  Bayou III, 396 B.R. at 844.  Whether Appellants took their transfers in "good faith," however, is hotly contested.

As the cases in this area often note, "the Bankruptcy Code does not define 'good faith'" and the "'legislative history related to section 548(c) never defines, and scarcely addresses, good faith.'"  Jobin, 84 F.3d at 1335 (quoting In re Telesphere Commc'ns, Inc., 179 B.R. 544, 557 n. 20 (Bankr. N.D. Ill. 1994)); see also Jimmy Swaggert Ministries v. Hayes (In re Hannover Corp.), 310 F.3d 796, 800 (5th Cir. 2002) ("[T]he bankruptcy code does not define 'good faith' and the statute's legislative history is quite thin."); Holber v. Dolchin Slotkin & Todd, P.C. (In re Am. Rehab & Physical Therapy, Inc.), No. 04-14562, 2006 WL 1997431, at *19 & n.21 (Bankr. E.D. Pa. May 18, 2006) ("The Bankruptcy Code does not define either 'good faith' or 'good faith transferee'. . . .[T]he legislative history related to Section 548(c) never defines, and scarcely addresses, good faith.").  As a result, courts have struggled in applying this term, and the case law discussing Section 548(c)'s good faith affirmative defense is marked by a lack of clarity if not outright confusion.  See generally In re Hannover Corp., 310 F.3d at 800 ("[T]here is little agreement among courts as to what conditions ought to allow a

transferee [the good faith] defense.  This is not surprising, as the variables are manifold.")
(citations omitted); Jobin, 84 F.3d at 1335 ("courts applying § 548(c) have generally
refused to formulate precise definitions"); Brown v. Third Nat'l Bank (In re Sherman), 67
F.3d 1348, 1355 (8th Cir. 1995) ("Good faith is not susceptible of precise definition and
is determined on a case-by-case basis."); Hayes v. Palm Seedlings Partners-A (In re
Agric. Research & Tech. Grp.), 916 F.2d 528, 536 (9th Cir. 1990) ("Courts have been
candid in acknowledging that good faith 'is not susceptible of precise definition.'"
(quoting Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 984 (1st Cir. 1983)); In re
Telesphere Commc'ns, 179 B.R. at 557 (noting that "there is no clear source of
interpretive guidance" in construing "good faith" and that "the courts have varied widely
in the general approach they have taken in deciding questions of good faith in the context
of fraudulent conveyance law"); 4 Collier on Bankruptcy, § 548.07[2] at 548-72 (15th ed.
2008) ("[t]he unpredictable circumstances in which the courts may find its presence or
absence render any definition of 'good faith' inadequate, if not unwise")

       The lack of clarity in the cases undoubtedly reflects "a tension between a
policy of protecting creditors from fraudulent transfers, and a policy of promoting the
ease and security of commercial transactions."[22]  In re Telesphere Commc'ns, 179 B.R.
at 557.  The outcomes in the cases also often appear "influenced substantially by the

---

[22]  The two-year fraudulent conveyance period itself reflects a compromise between
competing values.  Congress could have provided for recovery whenever an investor has
received a transfer from an insolvent entity and has been paid with another investor's
money under circumstances similar to those here.  It also could have set a longer period
for recovery than two years.  In recognition of the fact that concepts of fairness and
equity must yield at some point to the competing values of insuring "the ease and security
of commercial transactions," however, Congress cut off such claims after two years.

equities of the particular fact situations before the courts." Id.  A canvass of the relevant

case law, however, reveals broad agreement on the following principles:

>        The good faith test under Section 548(c) is generally presented as a two-
> step inquiry.  The first question typically posed is whether the transferee had information
> that put it on inquiry notice that the transferor was insolvent or that the transfer might be
> made with a fraudulent purpose.  While the cases frequently cite either fraud or
> insolvency, these two elements are consistently identified as the triggers for inquiry
> notice.  The fraud or insolvency predicate is set forth in countless cases, including those
> relied on by the Bankruptcy Court here.  See Bayou III, 396 B.R. at 845-46 (citing Jobin,
> 84 F.3d at 1338 (holding that a transfer is not taken in good faith "if the circumstances
> would place a reasonable person on inquiry of the debtor's fraudulent purpose"); Banner
> v. Kassow, 1996 U.S. App. LEXIS 30734, at *7 (2d Cir. Nov. 22, 1996) ("'transferee
> does not act in good faith when he has sufficient knowledge to place him on inquiry
> notice of the debtor's possible [in]solvency.'" (quoting In re Sherman, 67 F.3d at 1355));
> Terry, 432 F.Supp. 2d at 641 ("transferee must show . . . that he did not have knowledge
> of facts that should have reasonably put him on notice that the transfer was made in order
> to delay, hinder, or defraud creditors of the debtor.")).[23]

---

[23]  See also In re Hannover Corp., 310 F.3d at 800 (discussing notice in the context of
insolvency and fraudulent representations); Jobin, 84 F.3d at 1338-39 ("[A] reasonably
prudent investor in [the transferee's] position should have known of [debtor's] fraudulent
intent and impending insolvency and that he was therefore not entitled to the good faith
defense established by § 548(c)."); Plotkin v. Pomona Valley Imps. (In re Cohen), 199
B.R. 709, 719 (9th Cir. 1996) (acknowledging that inquiry notice issue turns on whether
information available to transferee did or did not "suggest fraud"); In re Sherman, 67
F.3d at 1355 (reciting the legal standard that "a transferee does not act in good faith when
he has sufficient knowledge to place him on inquiry notice of the debtor's possible
insolvency"); In re Bell & Beckwith, 838 F.2d 844, 849-850 (6th Cir. 1988) (investor put

on inquiry notice after "hearing [debtor] describe how he had used . . . stock to perpetuate a multi-million dollar fraud"); Armstrong v. Collins, No. 01 Civ. 2437 (PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620 (PAC), 2010 U.S. Dist. LEXIS 28075, at *82-83 (S.D.N.Y. Mar. 24, 2010) (holding that investor's good faith defense was meritless because he "could no longer 'safely turn a blind eye' to the mounting evidence that [debtor] was not engaged in legitimate business. . . . In late September, 2000, [debtor] testified that he told [investors] that he was using investor funds to trade for himself and had 'experienced significant losses.'" (citations omitted)); Boyer v. Crown Stock Distrib., Inc., No. 06 Civ. 409 (RM), 2009 U.S. Dist. LEXIS 12393, at *41-42 (N.D. Ind. Feb. 17, 2009) ("Because [investors] had no reason to know of the possibly fraudulent nature of the transaction that resulted in the distributions they received . . . they had no duty to investigate further."); Slone v. Lassiter (In re Grove-Merritt), 406 B.R. 778, 810 (Bankr. S.D. Ohio 2009) (holding that transferee was on inquiry notice because it "had long known of the Debtor's financial problems"); Bowers & Merna Auctions, LLC v. Lull (In re Lull), 386 B.R. 261, 271 (Bankr. D. Haw. 2008) ("[T]he courts define good faith required by Section 548(c) to mean that viewed objectively, the transferee neither knew nor should have known of the fraudulent nature of the transfer.") (quotations omitted); Jones v. Revels (In re Revels), No. 05-13351-3P7, 2007 Bankr. LEXIS 4687, at **17-18 (Bankr. M.D. Fla. Jan. 31, 2007) ("'Circumstances putting the transferee on inquiry notice as to a debtor's insolvency. . . .will preclude a transferee from asserting a good faith defense.'" (quoting Cuthill v. Kime (In re Evergreen Sec., Ltd.), 319 B.R. 245, 255 (Bankr. M.D. Fla. 2003))); Cadle Co. v. White, No. 02 Civ. 00030 (TPS), 2006 U.S. Dist. LEXIS 11671, at *27-28 (D. Conn. Mar. 21, 2006) ("The transferee's knowledge is objectively judged by assessing whether the transferee knew or should have known of the transferor's fraudulent intent or financial precariousness."); Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.), 333 B.R. 205, 234 (Bankr. S.D.N.Y. 2005) (explaining that "Courts have found that the transferee does not act in good faith if the transferee had knowledge of the debtor's unfavorable financial condition at the time of transfer. . . . [and] have further found 'a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency'" (quoting Jobin, 84 F.3d at 1336))); Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.), 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002) ("If the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent. . . . '[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.'" (quoting In re Sherman, 67 F.3d at 1355)); Wessinger v. Spivey (In Re Galbreath), 286 B.R. 185, 214 (Bankr. S.D. Ga. 2002) ("A transferee with sufficient knowledge of facts to place it on inquiry notice of a debtor's possible insolvency reasonably should have known of the insolvency."); Meeks v. Red River Entm't (In re Armstrong), 259 B.R. 338, 344 (Bankr. E.D. Ark. 2001) ("[Investor] failed to establish good faith under the objective standard of § 548(c) [because investor] possessed sufficient knowledge to place [it] on inquiry notice of debtor's possible insolvency [such as a notation in the debtor's file that it had a federal tax lien against it and that debtor was in a financially precarious state] and, therefore, [investor] is not

With respect to the nature of the fraud necessary to trigger inquiry notice, the cases are not clear as to whether the information indicating fraud must be specific to the transfer at issue, or whether it is sufficient if the transferee has information indicating that the transferor's activities in general might be fraudulent.  See In re Hannover Corp., 310 F.3d at 800.  The weight of the authority, however, indicates that a court should focus on the circumstances specific to the transfer at issue – that is, whether a transferee "reasonably should have known . . . of the fraudulent intent underlying the transfer." Jobin, 84 F.3d at 1336; see also In re Agric. Research & Tech. Grp., 916 F.2d at 536

---

entitled to the good faith defense pursuant to § 548(c)."); Moglia v. Universal Auto., Inc. (In re First Nat'l Parts Exch., Inc.), No. 98 C5915(JBG), 2000 U.S. Dist. LEXIS 10420, at *18-19 (N.D. Ill. July 12, 2000) ("[A] transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to ignore signs of fraud or insolvency on the part of the transferor."); Kaler v. McLaren (In re McLaren), 236 B.R. 882, 902 (Bankr. D.N.D. 1999) ("In light of this Court's findings of fact regarding Mr. McLaren's knowledge of his wife's impending bankruptcy and simultaneous instigation of, and participation in, the transfers which this Court concluded to be wholly fraudulent in nature, it is abundantly clear . . . that Mr. McLaren was utterly lacking in the good faith necessary to successfully invoke the shelter of § 548(c)."); In re Bennett Funding Grp, 232 B.R. at 573 ("In the context of a transfer that is avoided as constructively fraudulent, courts have held that the transferee acts in good faith only where it has an honest belief in the propriety of the activities in question, no intent to take unconscionable advantage of others, no actual intent to defraud others, and no knowledge that the transaction would operate to defraud others."); In re Cannon v. J.C. Bradford & Co., 230 B.R. 546, 593-94 (Bankr. W.D. Tenn. 1999) (citing factors such as knowledge of debtor's improper commingling of funds, acceptance of escrow checks in debtor's personal accounts, and debtor's bounced checks in determining that investor did not act in good faith); In re Armstrong, 231 B.R. 739, 744 (Bankr. E.D. Ark. 1999) (in evaluating good faith "[t]he court is required to inquire into whether the recipient had inquiry notice of the debtor's insolvency and whether the transaction carried the earmarks of an arms-length bargain"); Durkin v. Shields (In re Imperial Corp. of Am.), No. 92-1003-IEG (LSP), 1997 U.S. Dist. LEXIS 20943, at *13-14 (S.D. Cal. Aug. 12, 1997) ("While the Bankruptcy Code does not define 'good faith,' courts generally consider whether the transferee objectively knew or should have known of the debtor/transferor's fraudulent purpose."); In re Anchorage Marina, Inc., 93 B.R. 686, 693 (Bankr. D.N.D 1988) ("Transferees are not acting in good faith when they have knowledge sufficient to put them on at least inquiry notice of the debtor's possible insolvency.").

(courts look to whether "a reasonable person" would have been put on notice of "a debtor's fraudulent purpose"); Boyer, 2009 U.S. Dist. LEXIS 12393, at *41-42 (question is whether investors had "reason to know of the possibly fraudulent nature of the transaction that resulted in the distributions they received"); In re Lull, 386 B.R. at 271 (question is whether transferee "knew nor should have known of the fraudulent nature of the transfer"); Cadle Co., 2006 U.S. Dist. LEXIS 11671, at *27-28 (issue is whether "transferee "knew or should have known of the transferor's fraudulent intent"); Luzinski v. Gosman (In re Gosman), No. 01-30953-BKC-PGH, 2005 Bankr. LEXIS 3183, at *52 (Bankr. S.D. Fla. Mar. 1, 2005) (question is whether transferee had chosen to "remain willfully ignorant of facts which would alert her to the debtor's fraudulent purpose"); In re World Vision Entm't, Inc., 275 B.R. at 659 (issue is whether "'the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose'" (quoting In re Agric. Research & Tech. Grp., 916 F.2d at 536)); Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.), 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000) (question is whether transferee was aware "of any facts that would have caused a reasonable person to make further inquiry into the possible fraudulent purpose of the transaction"); In re Bennett Funding Grp., 232 B.R. at 573 (issue is whether transferee "has an honest belief in the propriety of the activities in question, no intent to take unconscionable advantage of others, no actual intent to defraud others, and no knowledge that the transaction would operate to defraud others"); In re Imperial Corp. of Am., 1997 U.S. Dist. LEXIS 20943, at *13-14 ("[C]ourts generally consider whether the transferee objectively knew or should have known of the debtor/transferor's fraudulent purpose.").

Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement.  Once again, the case law is not clear as to the nature of this requirement.  One line of authority holds that the transferee must demonstrate that it conducted a diligent investigation of the facts that put it on inquiry notice.  See, e.g., In re Manhattan Inv. Fund III, 397 B.R. at 22-23, 24 (stating that transferee was required to demonstrate that it "was diligent in its investigation of the Fund," which was later disclosed to be a Ponzi scheme).  The test is most commonly phrased, however, as whether "diligent inquiry would have discovered the fraudulent purpose" of the transfer.  In re Agric. Research & Tech. Grp., 916 F.2d at 536 (emphasis in original); see Jobin, 84 F.3d at 1338; In re Manhattan Inv. Fund II, 359 B.R. at 524; In re World Vision Entm't, Inc., 275 B.R. at 659; In re Polar Chips Int'l, Inc., 18 B.R. 480, 484 (Bankr. S.D. Fla. 1982)[24]; see also Wasserman v. Bressman (In re Bressman), 327

---

[24]  The difference in terminology can be critical.  For example, in In re Manhattan Inv. Fund II, the Bankruptcy Court – in rejecting the transferee's good faith defense under Section 548(c) and in granting summary judgment to the debtor – stated that the standard was whether a "diligent inquiry would have discovered the fraudulent purpose" of the transferor.  The Bankruptcy Court held as a matter of law that the transferee had not been diligent, because it had not "consult[ed] easily obtainable sources of information . . . bear[ing] on the truth of [the] explanation it had received from the potential wrongdoer." In re Manhattan Inv. Fund II, 359 B.R. at 524.  On appeal, the District Court reversed as to good faith, holding that the appropriate question was whether the transferee had been "diligent in its investigation."  While acknowledging that a year elapsed before the transferee obtained and reviewed readily available documents demonstrating the transferor's fraud, the Court held that under the circumstances, it was a jury question whether the transferee had been diligent in its investigation.  In re Manhattan Inv. Fund III, 397 B.R. at 22-23, 26.  The test posed by the District Court focused on the circumstances of the investigation actually conducted by the transferee – whether the transferee had acted reasonably given the information available to it over the course of a year – whereas the test applied by the Bankruptcy Court involved a more objective

F.3d 229, 236 (3rd Cir. 2003) ("If a transferee possesses knowledge of facts that suggest

a transfer may be fraudulent, and further inquiry by the transferee would reveal facts

sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby

preventing a finding that he has knowledge.").  Cf. Cissell v. First Nat'l Bank, 476 F.

Supp. 474, 483-84 (S.D. Ohio 1979) ("[I]f a creditor fails to make an inquiry when he has

a duty to do so, he will be charged with all the knowledge that he would have acquired

had he conducted such an investigation.").

        An objective, reasonable investor standard applies to both the inquiry

notice and the diligent investigation components of the good faith test.[25]  See Jobin, 84

F.3d at 1336 (noting that "the majority of bankruptcy courts construing 'good faith,' as it

is used in § 548(c), have followed [the objective standard], holding that a transferee who

reasonably should have known of a debtor's insolvency or of the fraudulent intent

underlying the transfer is not entitled to the § 548(c) good faith defense"); In re Sherman,

67 F.3d at 1355 ("[C]ourts look to what the transferee objectively knew or should have

known."); In re Agric. Research and Tech. Grp., 916 F.2d at 535-36 (same).  Under this

objective test, "courts look to what the transferee objectively 'knew or should have

known' in questions of good faith, rather than examining what the transferee actually

knew from a subjective standpoint."  In re Agric. Research & Tech. Grp., 916 F.2d at

535-36.

---

inquiry that focused on the fact that the key documents indicating fraud were readily
available at all times.

[25]  The parties agree that the "good faith" test under Section 548(c) is an objective,
reasonable person standard that does not require inquiry into the subjective knowledge
and belief of the transferee.  (Bayou Br. 84, 87; Sonn. Br. 39-40; CBHSE Br. 32, 38-39;
Freestone Br. 27-28)

Some courts have held that the standard is not governed by a generic, reasonable person test, but rather requires a specific focus on the class or category of the transferee.  Under these decisions, whether a transferee is on inquiry notice is informed by the standards, norms, practices, sophistication, and experience generally possessed by participants in the transferee's industry or class.  For example, in In re Manhattan Inv. Fund III, the District Court emphasized that the applicable standard in that case is what "would have caused a reasonable prime broker in [Bear Stearns'] position" to investigate whether its fund client was defrauding its investors. 397 B.R. at 23; see also Jobin, 84 F.3d at 1339 (discussing what "a reasonably prudent investor in [Defendant's] position should have known").  Applying these decisions here, the issue is whether the alleged "red flag" information would have put a reasonably prudent institutional hedge fund investor on inquiry notice that Bayou was insolvent or that it had a fraudulent purpose in making the redemption payments to Appellants.

### B. The Bankruptcy Court's Misapplication of the Legal Standards Governing the Good Faith Affirmative Defense Under Section 548(c)

#### 1. Inquiry Notice

In describing the information sufficient to trigger inquiry notice under Section 548(c), the Bankruptcy Court stated that the

> test is whether the defendant requested redemption after learning of a "red flag" which, under an "objective" standard, should have put the defendant on "inquiry notice" of some infirmity in Bayou or the integrity of its management.  The rule does not require that the "red flag" be of such specificity as to put the recipient on "inquiry notice" of the actual fraud, or embezzlement, or looting, or whatever ultimately proves to be the cause of loss.  It is sufficient if the red flag puts the investor on notice of some potential infirmity in the investment such that a reasonable investor would recognize the need to conduct some investigation.

Bayou III, 396 B.R. at 848 (emphasis added).[26]  In holding that information suggesting any "infirmity in Bayou or [in] the integrity of its management" is sufficient to trigger inquiry notice, the Bankruptcy Court significantly expanded the scope of information prior courts have found sufficient to require inquiry.[27]  "Some infirmity in the integrity of management" could cover a host of sins, including, inter alia, resume puffing, lying to employees or any other act of dishonesty, a failure to pay personal taxes, an unjustified refusal to pay a vendor, sexual harassment or sexual affairs.  The list is limited only by one's imagination.  The same is true as to "some infirmity in Bayou."  That phrase could include a poor business model, incompetent management, inadequate accounting controls, lack of research capabilities, poor marketing, insufficient capital, and a host of other deficiencies.  The phrase is so broad as to be undefinable.

As noted above, the great weight of authority holds that it is information suggesting insolvency or a fraudulent purpose in making a transfer that triggers inquiry notice.  Neither the Bankruptcy Court nor Bayou has cited any case law suggesting that the scope of triggering information is as broad as that announced by the Bankruptcy Court here.  To the contrary, and as noted above (see pp. 38-40, supra), the cases relied on by the Bankruptcy Court (see Bayou III, 396 B.R. at 845-46) and by Appellees (see Bayou Br. at 85, 87-88) recite the same insolvency/fraudulent purpose test.[28]

───────────────────

[26]  "Red flag" is a term connoting information that places a transferee on inquiry notice.

[27]  As noted earlier, the Bankruptcy Court acknowledged that its "views on certain aspects of the law . . . may be thought to differ in some respects from the case law." Bayou III, 396 B.R. at 847.

[28]  The Bankruptcy Court cites In re Manhattan Inv. Fund III, 397 B.R. at 22-23, for the proposition that "a transferee is on 'inquiry notice' if it knew or should have known of information placing it objectively 'on alert that there was a potential problem with the

In applying the "some infirmity" standard, the Bankruptcy Court

committed legal error.  The impact of the Bankruptcy Court's erroneous legal standard on

its summary judgment determination is discussed below (see pp. 58-60, 63-66, 69,

infra).[29]

_____

Fund' such that the transferee 'should have attempted to learn more.'"  Bayou III, 396
B.R. at 845 (emphasis added).

This quotation from In re Manhattan Inv. Fund III is taken out of context.  In context, it is
clear that the phrase "potential problem with the Fund" – as used in In re Manhattan Inv.
Fund III – refers to possible serious fraud, not a vague "infirmity."  Bear Stearns was
Manhattan Investment Fund's prime broker and – through a margin account maintained
by the Fund – a transferee.  Bear Stearns was familiar with the Fund's trading activity
and knew that the Fund had lost hundreds of millions of dollars in 1998 alone.  At a
December 1998 cocktail party, however, an investment adviser mentioned to a Bear
Stearns manager that the Fund was reporting a 20% profit for the year.  397 B.R. at 4-6.
Bear Stearns thus received information suggesting that the Fund was defrauding its
investors by reporting healthy profits when in fact it was suffering massive losses.
Nothing in In re Manhattan Inv. Fund III suggests that the broader standard for inquiry
notice applied by the Bankruptcy Court here is appropriate.

[29]  The Bankruptcy Court also improperly restricted the scope of evidence relevant to the
inquiry notice issue.  The Bankruptcy Court, for example, ruled that evidence of other
investors' reaction to the Westervelt complaint was irrelevant:  "[t]he fact that other
investors knew of the Westervelt complaint and did not investigate or redeem may reflect
on their diligence or perspicacity, but it is of no moment under the objective standard and
does not bolster the Section 548(c) defense of those investors who did redeem."  Bayou
III, 396 B.R. at 869.  The response of other similarly situated investors is not irrelevant,
however, to a factual determination of whether alleged "red flag" information would put
a reasonable hedge fund investor on notice of insolvency or fraudulent purpose.  While
the tests for inquiry notice and diligent investigation are objective, they are informed by
the reality of a transferee's market and industry.  Appellants have presented credible
evidence that other, similarly situated investors did not redeem and did not suspect
insolvency or fraud after learning of the Westervelt litigation and other alleged "red flag"
information.  In determining what weight a reasonably prudent institutional hedge fund
investor would have given the alleged "red flag" information, the fact finder may
consider the reaction and responses of such investors who did in fact receive the
information.  Cf. In re Manhattan Inv. Fund III, 397 B.R. at 23 ("the best evidence of
what a prudent prime broker would have done is what Bear Stearns actually did").

## 2.   <u>Diligent Investigation</u>

The Bankruptcy Court acknowledged that "a transferee cannot be found to have taken a transfer in good faith 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose and a <u>diligent</u> inquiry would have discovered the fraudulent purpose.'"  <u>Bayou III</u>, 396 B.R. at 844 (quoting <u>Jobin</u>, 84 F.3d at 1338) (emphasis in <u>Jobin</u>).  The Bankruptcy Court further acknowledged "that 'good faith' as used in section 548(c) must be determined according to an 'objective' or 'reasonable person' standard, and not on the subjective knowledge or belief of the transferee," and that "'subjective assertions of good faith . . . are of no moment.'"  <u>Id.</u> at 845 (quoting <u>In re Agric. Research & Tech. Grp.</u>, 916 F.2d at 536).  "Instead, 'courts look to what the transferee objectively "knew or should have known" in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint.'"  <u>Id.</u> (quoting <u>In re Agric. Research and Tech. Grp.</u>, 916 F.2d at 535-36).  Finally, the Bankruptcy Court expressed agreement with other courts that "'good faith' must be evaluated on a case-by-case basis," and cited with approval cases stating that "good faith" is "'not susceptible of precise definition.'"  <u>Id.</u> at 846 (quoting <u>In re Agric. Research & Tech. Group</u>, 916 F.2d at 536).  The analysis actually pursued by the Bankruptcy Court, however, involved application of several hard and fast rules, a number of which clearly implicate Appellants' subjective motives and reactions to the information they received.

As to rules applicable to the diligent investigation determination, the Bankruptcy Court at first states that – once a transferee is on inquiry notice – a failure to investigate will preclude assertion of a good faith defense.  <u>Id.</u> at 847. Later in its opinion, however, the Court announces an exception to this rule:  a transferee who conducts no investigation at all can claim the good faith defense by establishing that it redeemed

because of reasons that were unrelated to the information that put the investor on inquiry notice.  Id. at 849.  The Bankruptcy Court cites no legal authority for this proposition, see id. at 847, 849, but its analysis illustrates the difficulty in attempting to apply absolute rules in this area.

With respect to adequacy of investigation, the Bankruptcy Court states that a "diligent investigation" always "requires more than merely asking the transferor about the suspicious circumstances."  Id. at 846.  Moreover, a "'diligent investigation' must ameliorate the issues that placed the transferee on inquiry notice in the first place.'"  In other words, a transferee on inquiry notice must demonstrate that it conducted a diligent investigation that "allayed or set to rest the concerns aroused by the red flag [information]."  Id. at 846, 851-52.

In response to Appellants' arguments that "no amount of diligent investigation would have uncovered the Bayou fraud" – citing the failure of regulators, investment professionals, and hundreds of investors to discover the fraud over a period of more than seven years – the Bankruptcy Court held that such evidence is irrelevant, because Appellants' "futility argument" "fail[s] as a matter of law":  "The rule of law formulated by the courts interpreting Section 548(c) does not turn upon whether the investor-defendant could or should, or did or did not, actually discover the fraud."  Id. at 850.  Instead, the transferee must show that it "conduct[ed] a diligent inquiry reasonable under the circumstances" that "set to rest the concerns aroused by the red flag [information]."  Id. at 846, 849-52.  Finally, the Bankruptcy Court acknowledges that its test for a "diligent investigation" will almost never be met where a transferor is actually engaged in fraud:  "Once the investigation encounters evasion or stonewalling

exacerbating the concerns caused by the original red flag, the sensible investor will promptly redeem without spending more time and money on further inquiry." Id. at 852.

The rules of law announced and applied by the Bankruptcy Court – when combined with its expanded inquiry notice standard – render the good faith defense largely illusory whenever a transferor is actually engaged in fraud or is insolvent. As an initial matter, the Bankruptcy Court's interpretation of the "diligent investigation" test renders largely irrelevant the question of whether a "diligent inquiry would have discovered the fraudulent purpose" of the transfer. As noted above, numerous cases – including In re Agric. Research & Tech. Grp., 916 F.2d at 536; Jobin, 84 F.3d at 1338; Wiand v. Waxenberg, 611 F. Supp. 2d 1299, 1319-20 (M.D. Fla. 2009)(once transferee is on inquiry notice, the "relevant question" is whether an "inquiry, if made with reasonable diligence, would have led to the discovery of the [transferor's] fraudulent purpose"); In re Manhattan Inv. Fund II, 359 B.R. at 523-24; In re World Vision Entm't, Inc., 275 B.R. at 659; In re Polar Chips Int'l, Inc., 18 B.R. at 484 – apply this formulation in conducting the diligent investigation analysis. Indeed, the Bankruptcy Court itself acknowledges this element of the analysis. Bayou III, 396 B.R. at 844 (quoting Jobin, 84 F.3d at 1338). This component of the good faith test received short shrift before the Bankruptcy Court, however, which relied instead on its conclusion that Appellants' investigation had not "allayed or set to rest the concerns aroused by the [alleged] red flag [information]" they had received. Id. at 846, 851-52.

In this Court's view – and as many other courts have noted – the good faith determination does not lend itself to the application of rigid or absolute rules. Moreover, application of several of the rules announced by the Bankruptcy Court will

inevitably require courts to determine the subjective motives and intentions of transferees, in contravention of numerous cases holding that courts must apply an objective test to both the inquiry notice and diligent investigation components of the good faith test.  For example, in announcing an exception to its standard rule that no investigation means no good faith defense – an exception that applies to a transferee that can demonstrate that it redeemed solely because of a factor unrelated to the "red flag" information – the Bankruptcy Court creates an analytical framework that will require examination of a transferee's subjective motives and intentions.  Similarly, the Bankruptcy Court's requirement that a transferee demonstrate that its concerns about "red flag" information were put to rest will inevitably require an analysis of the transferee's subjective reactions to the information it received and its follow-up interactions with the transferor.

The Bankruptcy Court's argument that futility evidence is irrelevant to the diligent investigation inquiry is likewise not supported by the case law.  Bayou III, 396 B.R. at 850-51.  None of the decisions cited by the Bankruptcy Court or by Appellees indicate that evidence of futility is irrelevant to the diligent investigation inquiry.  Indeed, given that part of the applicable standard is whether a "diligent inquiry would have discovered the fraudulent purpose," Appellants are entitled to argue, and the Court is required to consider, whether a diligent investigation would have led to the discovery of Bayou's fraudulent purpose and/or insolvency.[30]  To the extent that the Bankruptcy Court

_____

[30] The purpose of the diligent investigation component of the good faith test is not addressed in the case law, but presumably it is tied to a belief that it is important for societal reasons to encourage investors who are on inquiry notice as to fraud or insolvency to investigate those concerns, at pain of being subject to a fraudulent

ruled that such evidence is irrelevant, it committed error.  Moreover, as discussed below, to the extent that the Bankruptcy Court reached the merits of this argument and concluded as a matter of law that Appellants could not establish that a diligent investigation would have been futile – relying on another investor's discovery that Marino was the registered agent for Richmond-Fairfield – the Bankruptcy Court improperly resolved a question of fact that must be presented to a jury.  (See pp. 69-72, infra).

        In sum – at least in a case such as this, where the fraud was not discovered – a transferee is entitled to offer evidence and to argue to the finder of fact that no diligent investigation would have disclosed the transferor's insolvency or fraudulent purpose.  If the transferee can meet its burden of demonstrating that a diligent investigation would not have led to discovery of the fraud, it may prevail on this prong of the good faith affirmative defense.

### C. Application of Proper Legal Standards to the Alleged "Red Flag" Evidence

#### 1. Did the "Red Flag" Evidence Put the Appellants on Inquiry Notice?

        The alleged "red flags" here are (1) allegations made in a lawsuit filed against Bayou by former Bayou principal Paul Westervelt; (2) Bayou's delay in providing net asset values ("NAVs") for Bayou Funds in March and April 2004, Bayou's

---

conveyance claim for two years after redemption.  Early disclosure of Ponzi schemes and other fraudulent enterprises is clearly in the interest of the investor community and the public at large.  See Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995) ("the longer a Ponzi scheme is kept going[,] the greater the losses to the investors"). Where a transferee can convince a finder of fact that a diligent investigation would not have led to discovery of the transferor's fraudulent purpose or insolvency, however, it is not apparent how this societal value is served in invariably permitting a debtor to avoid the transfer.

inconsistent statements about who was responsible for preparing NAVs, and Bayou's

ultimate disclosure that Bayou Management, rather than an offshore administrator, was

calculating NAVs for the Bayou Funds, and (3) negative information concerning Israel

and Bayou set forth in two background investigation reports.  Except for Freestone,

which received only the background investigation reports, it is undisputed that Appellants

or their investment advisors – Consulting Services Group ("CSG") and Centennial

Partners LLC – received all of the alleged "red flag" information.[31]  See Bayou III, 396

B.R. at 869-70.

### a.        Westervelt Complaint

On March 26, 2003 – more than two years before the Bayou Funds'

collapse – Paul Westervelt, Jr. and his son filed suit against Bayou Management, the

Bayou Funds, Bayou Securities, Israel and Marino in the United States District Court for

the Eastern District of Louisiana.  Except for Freestone, all of the Appellants (or their

investment advisors) received notice of the allegations in Westervelt's complaint.[32]

---

[31]  CSG is a registered investment advisor based in Memphis, Tennessee, and one of
several owners of Centennial Partners LLC, a hedge fund manager.  All Appellants other
than Freestone relied on investment advice and information provided by either CSG or
Centennial in managing their Bayou hedge fund investments.  Bayou III, 396 B.R. at 869.
Although the Sonnenschein Appellants argued before the Bankruptcy Court that
imputation of CSG's or Centennial's knowledge to them for purposes of their good faith
affirmative defense under Section 548(c) is improper, Bayou III, 396 B.R. at 873, they do
not renew that argument on appeal.

[32]  In early 2004, CSG obtained background reports concerning Israel and the Bayou
Funds from Back Track Reports, an investigative firm.  (Pltf. Ex. 14 (Voldeng Tr.) at 55-
56, 61-64; Pltf. Ex. 13 (Givoanetti Tr.) at 60; Pltf. Exs. 19, 20)  The Back Track report
described Westervelt's complaint.  (Pltf. Ex. 20 at 2, 4).  At CSG's request, Back Track
obtained and provided to CSG a copy of Westervelt's complaint, and CSG shared and
discussed the information it had obtained from the complaint with Centennial.  (Pltf. Ex.

Westervelt's complaint includes causes of action for breach of contract, infliction of emotional distress, and violation of Louisiana's "Whistleblower Statute" based on Westervelt's alleged refusal to "engage in unlawful practices that potentially exposed Bayou, and Westervelt as [a Bayou] principal, to criminal sanctions, professional censure, civil liability, as well as damage to his business relations and personal and professional reputation."  (Sonn. Ex. 10 ("Westervelt Cmplt.") ¶ XXIV)  The complaint contains the following relevant allegations:

- After a long, successful career in "investment management, investment counseling and fund management in and around the city of New Orleans," Westervelt was "actively recruited [by Israel and Marino] to become a principal and shareholder in Bayou."  (Westervelt Cmplt. ¶¶ VII-VIII)

- Westervelt agreed to join Bayou at a salary of $800,000 a year and "an immediate 25% ownership interest in Bayou Management, L.L.C."  (Id. ¶ IX)  Bayou also agreed to hire Westervelt's son at a salary of $90,000 per year plus an annual bonus.  (Id. ¶ X)

- Although Westervelt was a partner, Israel and Marino "failed to provide him access to, and actively prevented him from obtaining, critical business documents and financial information relating to Bayou, to which Westervelt was entitled and which he needed to conduct his business and protect his business interests and reputation."  (Id. ¶ XII)  This "caused Westervelt severe mental anguish and emotional distress."  (Id.)

- "Additionally, Westervelt, upon entering into the business arrangement with Bayou . . . discovered what he perceived to be possible violations of S.E.C. and N.A.S.D. rules and regulations."  (Id. ¶ XIII)  Westervelt was also concerned that defendants intended to use a new North Carolina office "for a purpose that he believed was improper and unethical and would be detrimental to Bayou's investors," but he was unable to "obtain[ the requested] information and records necessary to evaluate these matters."  (Id.)

---

14 (Voldeng Tr.) at 66-67; Pltf. Ex. 4 (Meals Tr.) at 53; Pltf. Exs. 22, 23, 27; Sonn. Ex. 33 (Wade Tr.) at 53)

- Westervelt was concerned that as a result of Bayou's planned activities in North Carolina "he might be exposed to criminal charges, professional censure, and civil liability," due to his involvement in Bayou. (Id.)

- Westervelt had obtained "documentation from which he learned that Bayou's capital trading account . . . had been depleted by more than $7 million in December 2002. . . . The activity included a withdrawal of $ 4.2 million on December 26, 2002 for which he could obtain no explanation. Although Westervelt repeatedly asked Israel and Marino to explain the depletion of Bayou's capital account in December 2002, he never received any explanation, nor was he provided any subsequent account statements demonstrating further activity in that account." (Id. ¶ XVII)

- Defendants failed to "execute the documents formally conveying" Westervelt's partnership interest and "[i]n response, and in retaliation for requesting information and refusing to engage in any illegal, improper, unethical, or detrimental conduct, Bayou, Israel and Marino terminated Westervelt's contract" and his son's employment. (Id. ¶¶ XVIII, XIX)

Attached as exhibits to Westervelt's complaint are an agreement outlining the terms of Westervelt's partnership, brokerage account statements showing a $4.2 million transfer from Bayou Securities, and a March 9, 2003 letter from Westervelt to Israel.

The word "fraud" does not appear in Westervelt's complaint, nor does the complaint contain any reference to or suggestion of insolvency. Westervelt's allusions to possible criminal or regulatory violations are not explained. Moreover, Westervelt's March 9 letter to Israel – attached as an exhibit to the complaint – significantly undercuts any suggestion that Westervelt believes that Israel and Bayou are involved in fraud. Indeed, in his letter to Israel, Westervelt states that he is "honored" to be working at Bayou, and that he is prepared to arrange for his clients to invest $5 to $10 million in the Bayou Funds "immediately." (Westervelt Cmplt., Ex. C) In short, it appears clear from the letter that Westervelt wants to continue his relationship with Bayou, but also wants

54

certain concerns addressed.  As discussed below, those concerns relate to Dan Marino's bullying and boorish behavior.  (Id.)

Westervelt's letter to Israel – written eight days before Westervelt and his son were fired and about two weeks before Westervelt filed suit – begins with complaints about Westervelt's "calls go[ing] answered," and about the general "disorganization" at Bayou.  Westervelt tells Israel that he is "honored to be involved with Bayou and would truly enjoy being your partner, but things have got to change."  (Id.)

Westervelt goes on to state, "you/we need to be involved in the day to day management of Bayou":

> Dan [Marino] is ill-equipped to do anything in the management area.  As a matter of fact, I cannot really find anything other than accounting that he can handle. . . . Dan, in my opinion is devoid of people skills and uses his position to bully the employees. . . . I personally find his behavior in the office to be repulsive, not to mention illegal.  Sam, this man represents a huge liability that will cause serious repercussions at some point in the near future. . . .

> Sam, I have had concerns about Dan since I first met him, but certainly since he completely distorted our verbal agreement in the first written contract.  I saw the real Dan Marino shortly after my first visit to the office in Connecticut.  His behavior and his language were not only disgusting but also fodder for a huge lawsuit.  He actually threatened to kill Mark Steiner in any number of ways at a volume level that everyone could hear.

> Between October and early December I witnessed four separate incidents of incredible behavior on Dan's part.  He was yelling profane and demeaning language while walking around the office looking for someone to pick on.  He fired Tom on two separate occasions and totally intimidated everyone except those in the trading room.  I was so concerned that I brought the Employee Manual over to your house to discuss our liability.

(Id.)

Westervelt goes on to complain that Marino has "blocked or attempted to block our partnership agreement," has instructed back-office personnel not to give

55

information to Westervelt and refused Westervelt's requests for information "in a very

rude fashion," has intercepted Company credit cards intended for Westervelt and his son,

and has demanded that no one but Marino park in the two parking places closest to the

office.  (Id.) "I know you have a very strong loyalty towards Dan and I respect that, but at

what point do you draw the line."  Westervelt closes by saying that he is prepared to

"bring 5 to 10 million into the fund immediately" but has "been reluctant to do so

because of the instability at Bayou. . . . I will work hard or harder if necessary to make

Bayou a success, but I need to know that we are of the same mind.  Respectfully Your

Partner, Westy."  (Id.)

       Westervelt was fired eight days after sending this letter to Israel, and he

filed his lawsuit nine days after his termination.  (Westervelt Cmplt.)  The District Court

dismissed Westervelt's complaint on November 3, 2003, because the dispute was subject

to arbitration under NASD rules.[33]  (Sonn. Ex. 11)

---

[33] The parties then engaged in arbitration.  At his deposition in connection with the
arbitration proceeding, Westervelt admitted that his alleged "concerns about illegal
conduct or regulatory violations" were merely "suspicions."  (Sonn. Ex. 13 (Westervelt
Tr.) 39:06-11)

On November 3, 2004, long after all of the Appellants had redeemed their investments in
the Bayou Funds, Israel wrote a letter to the Bayou Funds' investors responding to
Westervelt's allegations.  (Sonn. Ex. 15)  The letter describes Westervelt's refusal to
"follow the Bayou trading methods . . . [and asserts that] the relationship with Westy was
deteriorating" in the period before he was asked to leave.  (Id.)  The letter further states
that Westervelt's "numerous unsubstantiated allegations and claims regarding conduct by
various Bayou entities and individuals" in the course of the arbitration were never
supported by any evidence of wrongdoing by Bayou.  (Id.)  Israel also writes that "while
the effect of [the litigation] seems significant in the public arena, NO ARBITRATION
can create ANY LIABILITY FOR THE INVESTORS IN THE FUND. . . . These are
nothing more than the nuisances that we deal with and DO NOT in any way affect the
performance of the fund."  (Id.) (emphasis in original),

On December 15, 2004, the parties entered into a settlement agreement in which Bayou
agreed to pay Westervelt $1.6 million.  (Sonn. Ex. 14)

At CSG's request, BackTrack Reports, Inc. – a background investigation firm that had prepared a report on Israel and Bayou – attempted to interview Westervelt about his allegations.  Westervelt refused to comment, except to say that BackTrack was "doing the right thing" in following up and that he "would not do business" with Israel. (Pltf. Ex. 24; Pltf. Ex. 14 (Voldeng Tr.) at 71-72).

CSG also contacted Israel directly to discuss Westervelt's complaint. (Sonn. Ex. 35 ¶ 11; Pltf. Ex. 13 at 61, 66)  Israel told CSG that "Mr. Westervelt was a disgruntled employee who did not work out, was terminated and subsequently sued Bayou."  (Sonn. Ex. 35 ¶11).  This explanation "initially satisfied" CSG.  (Pltf. Ex. 13 at 66-67)  On June 3, 2004, however, CSG requested a meeting to discuss, inter alia, Westervelt and his claims, including his employment history at Bayou and ultimate termination, and allegations concerning the $4.2 million withdrawal.  (Pltf. Ex. 13 at 74; Pltf. Ex. 14 (Voldeng Tr.) at 85; Pltf. Ex. 27; CBHSE Ex. 12 (Giovanetti Aff.), Ex. C)

When questioned by CSG and Centennial about the Westervelt lawsuit at a June 22, 2004 meeting, however, Marino refused to provide any substantive response, stating that the lawsuit had been sent to arbitration and had been resolved.  (Sonn. Ex. 13 at 98; Sonn. Ex. 14 at 108-09; Sonn. Ex. 35 ¶¶ 17, 18; Sonn. Ex. 50 at 99-100)  On June 25, 2004, CSG sent a letter to its clients recommending that they redeem their investments in Bayou (CBHSE Ex. 12 (Giovanetti Aff.), Ex. F),[34] and all of the

---

[34]  In the June 25, 2004 letter to clients, CSG explains that CSG had become "aware of two matters pertaining to Bayou Management Company," referring to the Westervelt litigation and the NAV calculation issue discussed below.  CSG states that "[g]iven that we cannot determine the significance of the legal claims [by Westervelt] and cannot verify the accuracy of the performance or NAV calculations claimed by Bayou for the Fund in which you are invested, we feel it only prudent to recommend that you request a

Appellants (excluding Freestone) redeemed in late June 2004.  Bayou III, 396 B.R. 872-

79.  In a June 23, 2004 letter to Israel explaining his decision to recommend redemption,

CSG's chief executive officer cited – inter alia – Westervelt's allegations that Bayou had

"violat[ed] SEC and NASD rules and regulations" and had breached its fiduciary duty to

investors.  (CBHSE Ex. 12 (Giovanetti Aff), Ex. E)

<strong>i.    The Bankruptcy Court Erred in Ruling<br/>As a Matter of Law that the Westervelt<br/><u>Complaint Put Appellants on Inquiry Notice</u></strong>

The Bankruptcy Court ruled that

> [v]iewed objectively, the Westervelt complaint was a clarion call for a
> Bayou investor to ask questions and get answers beyond Israel's
> dismissive retort that Westervelt was just a disgruntled employee.  Those
> who attempted to do this were met with obfuscation and stonewalling,
> alerting them that there might be some problem with Bayou or its top
> management, and they understandably redeemed.

Bayou III, 396 B.R. at 869.

While the Westervelt complaint might be read as indicating "some

problem with Bayou or its top management," as discussed above, that is not the

appropriate standard for determining whether a transferee is on inquiry notice.

Westervelt's allegations about Marino's personality issues might trouble some investors –

---

full redemption of your investment in these Funds at the next possible redemption date."
(CBHSE Ex. 12 (Giovanetti Aff.), Ex. F)  The letter "stress[es]," however, that CSG is:

> not aware of any claims or actions that your account is not worth what Bayou
> states it is. . . . It is also important to note that our concerns are not about [Israel's]
> reported performance that has been electronically provided by Bayou to many of
> you as well as CSG.  This performance places Bayou among the better performing
> hedge funds in our universe.  We still have confidence in Mr. Israel's trading
> abilities but our concerns over his administrative and back office operations, and
> especially their uncooperative attitude, makes it impossible to recommend you
> maintain an investment in the Bayou Funds.

(Id.)

given the critical role that Marino played as CFO at Bayou – but the Westervelt complaint and its exhibits cannot fairly be read as suggesting – as a matter of law – that Bayou might be insolvent or that any transfer from Bayou might be made with a fraudulent purpose.  Indeed, even if the Westervelt complaint could be read as suggesting the possibility of ongoing fraud at Bayou, any such suggestion is significantly undercut by Westervelt's contemporaneous expression of enthusiasm about continuing his work at Bayou – and promise to bring in $5 to $10 million in additional investment – if the Marino problem is addressed.

Appellees have not cited any case law to this Court suggesting that Westervelt's vague and conclusory allegations of criminal, regulatory and ethical wrongdoing are sufficient – as a matter of law – to trigger inquiry notice.  Indeed, the contrast between Westervelt's allegations and the sort of information generally held adequate to trigger inquiry notice is striking.  See, e.g., Jobin, 84 F.3d at 1338-39 (investor promised 468% return, use of postdated checks to pay investors, check to investor returned for insufficient funds); In re Sherman, 67 F.3d at 1355 (transferees on inquiry notice of insolvency where they knew that debtors had incurred substantial medical debts, were the subject of an impending suit for non-payment, were behind in their mortgage payments, and were facing foreclosure proceedings); In re Agric. Res. & Tech. Grp., 916 F.2d at 539 (transfer received "was grossly in excess of the value" transferee had provided); In re Manhattan Inv. Fund III, 397 B.R. at 23-24 (knowledge that transferor was simultaneously suffering huge losses and reporting 20% profit to investors); In re Model Imperial, 250 B.R. at 779 (bank transferee's conduct "was

inconsistent with industry practice and in violation of its own written policies and procedures").

At best, it is a jury question whether the allegations made by Westervelt – a fired employee who, shortly before his discharge and subsequent lawsuit, had expressed great enthusiasm and support for Bayou and Israel – concerning a denial of access to financial information, an unexplained withdrawal of $4.2 million, possible but unspecified regulatory violations, "improper and unethical conduct detrimental to Bayou's investors," and possible unspecified criminal activity, would have suggested to a reasonably prudent institutional hedge fund investor that Bayou might be insolvent or that any transfer from Bayou might be made with a fraudulent purpose.  While the Westervelt complaint passes muster under the Bankruptcy Court's expanded, incorrect standard for inquiry notice, under the proper standard, the complaint does not provide an adequate basis to rule as a matter of law that Appellants were on inquiry notice.

### b.  NAV Calculations

In February 2004, CSG – the investment advisor for a number of the Appellants – began making investment decisions for a client who invested in one of Bayou's offshore funds.  This client requested that it be provided with the offshore fund's monthly NAV calculations.  (Sonn. Ex. 35 ¶ 12)  Despite CSG's requests, Bayou failed to provide the NAVs for April and May 2004.  On June 1, 2004, CSG e-mailed the Bayou offshore administrator in an attempt to obtain the NAVs for March and April of 2004. (Pltf. Ex. 25)  The offshore administrator explained that it had not been able to issue the NAVs because it had not received the values from Bayou Management, indicating that the offshore administrator – contrary to CSG's understanding – was not independently

calculating NAVs.  (See Pltf. Ex. 15 at 57 (stating that CSG was "surprised that the administrator was not independently computing the NAVs from records from the prime broker . . . because it was contrary to what our understanding was of the role of the administrator in the fund"))  The offshore administrator informed CSG that it "did not see any prime broker or custodial statements and d[id] not price any securities or strike any NAV's.  [CSG] asked if [the offshore administrator] confirm[ed] asset balances in the account and he said they did not."  (Id.)

CSG contacted Marino about the delay in issuing the NAVs, and Marino responded that he would contact the offshore administrator to find out why the NAVs had not been issued, a statement that CSG viewed as inconsistent with the offshore administrator's account.  (Sonn. Ex. 37 ¶¶ 9-10)  CSG eventually received the NAVs from Bayou, but never obtained any explanation for the inconsistencies, confusion and delay in providing them.  (Pltf. Exs. 26, 33, 14 at 77-78)

CSG was troubled by the fact that the offshore administrator was not independently calculating the NAVs, and was concerned that it did not have "transparency in . . . document[ing] on behalf of [its] client [] how the net asset value was being calculated."  (Pltf. Ex. 13 at 73)  On June 3, 2004, CSG called Marino and requested a "due diligence meeting" concerning the calculation of NAVs and the Westervelt litigation.  (Pltf. Ex. 13 at 74; Sonn. Ex. 35 ¶ 16)  Marino agreed to a meeting and asked that CSG send him an email outlining the issues CSG wished to discuss.  (Id.)

With respect to the NAV issue, CSG's June 3, 2004 email listed the following:

      1.  Confirmation of the NAV calculation for the various
Bayou funds in which CSG/AIS/Centennial clients are
invested.

-We will need to be able to review supporting statements
from your prime broker.

-Review of internal reconciliation procedures.

-Permission to discuss with Bayou's independent auditor
the procedures used in preparing the annual audit reports.

-Review of independent auditor[']s review of Bayou's
Internal Controls and Procedures.

(CBHSE Ex. 12 (Giovanetti Aff.), Ex. C)

      At a June 22, 2004 meeting with representatives of CSG and Centennial,

however, Marino refused to supply any of the requested documents and information or to

arrange a meeting with Bayou's auditor.  (Sonn. Ex. 37 ¶¶18-20)

      On June 23, 2004 – the day after the meeting – CSG's CEO sent a letter to

Israel expressing "extreme[] disappoint[ment] and frustrat[ion] with the treatment" he

and his colleagues had received at Bayou.  (CBHSE Ex. 12 (Giovanetti Aff.), Ex. E).

With respect to the NAV issue, the letter states:

> we were in need of reviewing the NAV calculation procedure and
> independently verifying the veracity of the performance numbers being
> provided by Bayou to the offshore administrator.  Independent verification
> is a critical component in preventing fraud, one of the more significant
> risks in hedge fund investing.  Once we discovered that the offshore
> administrator did not verify the information, we were left with no
> alternative but to do so ourselves.  Again, despite having been told of this
> desire before hand, Mr. Marino refused to cooperate with our efforts.

(Id.)  The letter concludes by stating that CSG intends to recommend to its clients that

they redeem their investments in the Bayou Funds.  (Id.)

As discussed above, on June 25, 2004, CSG sent a letter to its clients recommending that they redeem their Bayou hedge fund investments.  (Id., Ex. F)  With respect to the NAV issue, the letter states:

> we learned that the new offshore administrator hired by Bayou for Bayou Fund LTD was not independently computing or verifying the NAV calculations provided monthly by Bayou.  While this is not unheard of in the offshore fund industry, it is not deemed a "best practice" by CSG and does not provide one of the checks that we prefer.  We informed Bayou that due to this situation, we felt it necessary to perform our own internal check on the NAV calculation process and to independently verify a recent NAV by reviewing Prime Broker statements and reconciliation for that period.
>
> *     *     *     *
>
> Mr. Marino refused to allow this review and became rather agitated at the request.  After several attempts to explain how this was a normal procedure for us in situations where other independent verification was not a part of the procedure, Mr. Marino declined our request and left the room.
>
> *     *     *     *
> Given that we cannot . . . verify the accuracy of the performance or NAV calculations claimed by Bayou for the Fund in which you are invested, we feel it only prudent to recommend that you request a full redemption of your investment in these Funds at the next possible redemption date.

(Id.)

### i.      The Bankruptcy Court Erred in Ruling As a Matter of Law that Bayou's Conduct in Connection With the NAV Calculation Issue Put Appellants on Inquiry Notice

The Bankruptcy Court held that Bayou's handling of the NAV calculation issue put Appellants on inquiry notice that (1) there were issues concerning "the fiscal and financial integrity of Bayou and the probity of Israel and Marino"; and (2) "there was some problem with the Bayou hedge funds which could not withstand the scrutiny which the [Appellants were] entitled to and [were] denied."  Bayou III, 396 B.R. at 873, 875. As with the Westervelt complaint, if the Bankruptcy Court's test for inquiry notice were

correct, there is no question that its finding as to the NAV calculation issue would be
upheld.  The question is not, however, whether the evidence concerning the NAV
calculation issue suggests that there is reason to doubt the financial integrity of Bayou
and the probity of its management, or even whether "there was some problem" at Bayou
that "could not withstand scrutiny."  Instead, the relevant question is whether Bayou's
handling of the NAV calculation issue would suggest to a reasonably prudent institutional
hedge fund investor that Bayou might be insolvent or that a transfer from Bayou might be
made with a fraudulent purpose.  Looking at the evidence in the light most favorable to
Appellants – as this Court must – this issue cannot be resolved as a matter of law in
Bayou's favor.

        As an initial matter, while the Bankruptcy Court appears to have accepted
Bayou's argument that Appellants had a contractual right – under the Bayou Funds
operating agreements – to demand the information they sought concerning NAV
calculations, see Bayou III, 396 B.R. at 871 n. 19, that is far from clear.  Marino asserted
at the June 22, 2004 meeting that Bayou had no such obligation.  (Pltf. Ex. 14 (Voldeng
Tr.) at 108; Pltf. Ex. 13 (Giovanetti Tr.) at 104-05)  Appellees have cited nothing in the
operating agreements suggesting that Bayou was contractually obligated to permit
Appellants to meet with Bayou's auditor to discuss audit procedures.  Similarly,
Appellees have cited nothing in the operating agreements suggesting that Bayou was
obligated to permit Appellants to review the auditor's analysis of Bayou's internal
controls and procedures.  Moreover, nothing in the operating agreements requires Bayou
to share its internal reconciliation procedures with investors.  As to "supporting
statements from Bayou's prime broker [i.e., Bayou Securities]," Section 9.9 of the Bayou

revised operating agreement requires each Bayou fund to "maintain records and accounts of all operations and expenditures of the [Fund]," including articles of organization, tax returns, financial statements, and certain meeting minutes, and Section 6.4 states that "[i]n accordance with Section 9.9 below, the Manager [i.e., Bayou Management LLC] shall maintain and preserve . . . all accounts, books, and other relevant [Fund] documents," and shall make available to investors for inspection and copying "those [Fund] documents."  (Sonn. Ex. 26, §§ 6.4, 9.9)  Even assuming that Bayou Management LLC's contractual obligations under Section 6.4 extend to statements received from Bayou's prime broker, it is apparent that Bayou was not contractually obligated to supply much of what Appellants sought.

Whether Marino's refusal to provide such information would suggest to a reasonably prudent institutional hedge fund investor in June 2004 that Bayou was insolvent, or that any transfer from Bayou might have a fraudulent purpose, is an issue that cannot be resolved as a matter of law.  Appellants have offered evidence that hedge fund managers at that time were reluctant to share specific information with investors and resisted transparency.  (Sonn. Ex. 28 at 49).  Hedge funds were not required in 2004 to produce audited financial statements or to follow rigorous auditing rules (id. at 49-51, 57-58, 65), and the Bayou Fund operating agreements imposed no obligation on Bayou to produce audited financial statements.

Moreover, as Appellants' evidence indicates (id. at 56), and as CSG states in its letter to clients (CBHSE Ex. 12 (Giovanetti Aff.), at Ex. F), at that time offshore administrators for certain hedge funds did not provide independent prices and relied on valuations provided by the hedge fund advisor.  Under all of these circumstances, and

given that Bayou was not contractually obligated to supply much of the information

sought by Appellants, or to grant the access to its auditor that Appellants demanded, this

Court cannot conclude as a matter of law that any reasonable institutional hedge fund

investor would suspect insolvency or fraud based on Marino's conduct.

**c.      Background Investigation Reports**

Freestone Low Volatility Partner, L.P. ("Freestone") is a hedge fund that

invests in other hedge funds.  Freestone invested $5.8 million in the Bayou Accredited

Fund and redeemed its investment in full on October 28, 2004.  (Freestone Ex. 12); <u>see</u>

<u>also</u> <u>Bayou III</u>, 396 B.R. at 880.

In the fall of 2004, CheckFundManager.com, a background investigation

firm, offered Freestone an opportunity to receive a free background investigation report.

(Pltf. Ex. 77 (Furukawa Tr.) at 51-52)  According to Freestone, it selected Israel and

Bayou as the subject of that free report, because Bayou was a small firm with fewer

controls and used its own broker-dealer.  (<u>Id.</u>)  CheckFund's report on Israel and Bayou,

dated October 11, 2004, includes the following relevant information:

1.      while Israel had attended Tulane University, he did not receive a
        degree from that institution;

2.      Westervelt's lawsuit, but only the fact that Westervelt was alleging
        breach of contract.  A docket sheet attached to the report revealed
        that Westervelt's lawsuit had been dismissed in November 2003;

3.      a 2002 civil suit brought by a consultant against Bayou and Israel;

4.      a 2003 NASD regulatory action against Israel for permitting two
        unregistered employees to make OTC securities trades, resulting in
        an $8500 fine;

5.      a 2004 customer complaint alleging excessive trading, which was
        settled; and

66

> 6.    a 2003 State of Connecticut $7500 administrative fine imposed on Bayou Securities for record violations.

(Pltf. Ex. 83)

Freestone also received a background investigation report concerning Israel and Bayou from BackTrack Reports, Inc., dated October 14, 2004.[35]  This report suggests that Israel had exaggerated the nature of his responsibilities at Omega Advisors, where he was employed between 1993 and 1995.  While Israel had represented that he had been the firm's head trader, an Omega executive told BackTrack that Israel never held that title or role at Omega.  (Pltf. Ex. 82)  The BackTrack report also discloses that four lawsuits had been filed against Israel:

> 1.    a 1992 New York State case in which a landlord sued Israel for non-payment of rent;

> 2.    a 2000 automobile forfeiture action – discontinued – arising from an allegation that Israel had been driving while under the influence of alcohol and was found in criminal possession of a controlled substance;

> 3.    Westervelt's lawsuit, which BackTrack reported involved Westervelt's claims that he "discovered what he perceived to be possible violations of SEC regulations governing the operation of hedge funds, as well as other perceived possible violations of SEC and NASD rules and regulations."[36]  BackTrack reported that Westervelt was suing for breach of contract and for violation of Louisiana's "Whistleblower Statute," and complained that Israel and Marino had denied him access to critical records and financial information relating to Bayou.  BackTrack also reported that Westervelt alleged that he became concerned that Bayou, Israel and Marino might "intend to use the North Carolina [Bayou] brokerage office for a purpose he believed was improper and unethical and would be detrimental to Bayou's investors."  BackTrack attempted to interview Westervelt in May 2004, but

---

[35]  CSG obtained this same report.  (Sonn. Ex. 35 ¶¶ 9-10)

[36]  It is undisputed that Freestone never received or reviewed a copy of the Westervelt complaint.  (Pltf. Ex. 77 at 60; Pltf Ex. 78 at 46)

> Westervelt stated that he could not answer questions about his allegations, because the matter was in arbitration; and
>
> 4.     a 2002 breach of contract lawsuit brought by a consulting company against Israel and Bayou that had been dismissed with prejudice.

(Id.)

These background reports "revealed a number of matters that caused Freestone to be concerned about the integrity of Sam Israel," including, in particular, Westervelt's complaint, the consultant's lawsuit, the Omega executive's report indicating that Israel had exaggerated his prior work experience, and Israel's arrest for driving under the influence of alcohol and criminal possession of a controlled substance.  (Pltf. Ex. 80 (Def. Resp. to Pltf. Interrog. No. 6))  The litigation, in particular, concerned Freestone, because Bayou had previously told Freestone that it was not involved in any litigation. (Pltf. Ex. 77 (Furukawa Tr.) at 55-56)  Freestone believed that Bayou had "lied" about this issue.  (Id. at 56)  Moreover, Freestone's general partner, Gary Furukawa, has a "general bias against people that are involved in lots of litigation."  (Id. at 53, 58)

Freestone contacted Bayou on October 15, 2004 "to get clarification on things that were in the background report, just to hear their side of the story."  (Id. at 54) On October 26, 2004, Freestone and Marino discussed the issues raised by the background reports during a conference call.  Israel did not participate.  (Id. at 67-68) Freestone found Marino "evasive and quite defensive" (Pltf. Ex. 78 (Miyoshi Tr.) at 38-39), "which did not alleviate Freestone's concerns."  (Freestone Br. 10)

After the conference call, Freestone redeemed its entire investment in Bayou Accredited "despite the fund's excellent performance."  (Pltf. Ex. 77 (Furukawa Tr.) at 70, 81; Pltf. Ex. 84 at 4; Pltf. Ex. 85)  In its October 28, 2004 letter to Bayou

redeeming its investment, Freestone stated that it felt that "it is in our investors' best interests that our fund avoid . . . managers/entities that have had significant litigation." (Freestone Ex. 12)

> **i.     The Bankruptcy Court Erred in Ruling
> As a Matter of Law that the Background Investigation
> <u>Reports Put Freestone on Inquiry Notice</u>**

The Bankruptcy Court held that because "Freestone has not asserted any reason for its decision to redeem its Bayou Accredited Fund investment other than its concerns with the integrity of Bayou management prompted by the <u>Westervelt</u> litigation and the other information contained in the two investigative reports," there is "no basis for Freestone to invoke the good faith affirmative defense under Section 548(c)." <u>Bayou III</u>, 396 B.R. at 881. While the background reports and Bayou's response to Freestone's follow-up inquiry undoubtedly raise questions about "the integrity of Bayou management," this Court cannot find, as a matter of law, that a reasonable institutional hedge fund investor – based on this information – would have suspected that Bayou might be insolvent or that any transfer obtained from Bayou might be made for a fraudulent purpose.  In particular, and as discussed above, the question of whether Westervelt's allegations put the Appellants on inquiry notice raises issues of fact that must be resolved by a jury.  Accordingly, the Bankruptcy Court's ruling, as a matter of law, that Freestone was on inquiry notice cannot stand.

> **2.     <u>Diligent Investigation</u>**

This Court's determinations that the Bankruptcy Court applied an incorrect legal standard in holding that Appellants were on inquiry notice, and that material issues of fact exist as to the inquiry notice issue, require that the Bankruptcy Court's grant of summary judgment in Bayou's favor be reversed.  For this reason, and

given the earlier analysis of the Bankruptcy Court's treatment of the diligent investigation prong of the good faith test, this Court's remaining discussion of the diligent investigation issue will be brief.

As discussed above (see pp. 47-51, supra), in considering the diligent investigation component of the good faith test in a context where the fraudulent purpose or insolvency was not discovered, courts have commonly analyzed, inter alia, whether a "diligent inquiry would have discovered the fraudulent purpose" of the transfer or the transferor's insolvency.  Here – in the event that a jury concludes that Appellants were on inquiry notice – it will be instructed to resolve material issues of fact both as to whether (1) the Appellants conducted a "diligent investigation" under the circumstances; and (2) a diligent investigation would have uncovered Bayou's fraud.  Bayou has not demonstrated that either issue can be resolved as a matter of law.

The Bankruptcy Court ruled that no reasonable jury could find that a diligent investigation would not have uncovered Bayou's fraud, relying on the experience of a Bayou investor, Altegris Investments ("Altegris") – apparently the only one of Bayou's 325 investors to have discovered that Bayou's representation that Richmond-Fairfield was an independent auditor was a fraud.  See Bayou III, 396 B.R. at 850, 865-66.

Altegris is a registered broker-dealer offering hedge funds and other investments to clients.  Altegris entered into an agreement with Bayou Management in which it agreed to recommend Bayou funds to its clients.  In June 2004, Altegris learned that Bayou's off-shore administrator was not independently calculating the NAVs of the Bayou funds.  As a result, Altegris asked Bayou to permit Altegris to conduct its own

verification of NAVs.  Bayou refused that request.  Altegris then decided to review the

Bayou Funds' audited financial statements and to contact Bayou's auditor, Richmond-

Fairfield.  As part of that inquiry, Altegris searched New York Department of State

records to determine whether Richmond-Fairfield was a registered accounting firm.

Altegris's research revealed that the firm was registered with the State of New York, but

that Marino was its "registered agent."  Two days later, after Marino failed to provide an

adequate explanation for his relationship with Richmond-Fairfield, Altegris

recommended to its clients that they redeem their investments in Bayou.  (Id. at 865-66).

    In rejecting Appellants' "futility argument" as a matter of law, the

Bankruptcy Court noted that Altegris's experience "graphically undermines the

contentions of a number of the defendants . . . that no reasonable due diligence could

have discovered the Bayou fraud."  Id. at 866.  While the ease with which Altegris

discovered that Richmond-Fairfield was not an independent auditor is clearly information

that a fact-finder can and should take into consideration in determining whether a diligent

investigation would have disclosed Bayou's fraud, it does not suggest that the diligent

investigation inquiry can be resolved as a matter of law.  In re Manhattan Inv. Fund III is

instructive in this regard.

    As discussed above, in that case, Bear Stearns learned that the Manhattan

Investment Fund – for which Bear Stearns served as prime broker – was reporting to

clients a 20% profit for 1998.  As a result of its responsibilities in connection with the

Fund's trading activity, Bear Stearns knew that the Fund had lost between $150 and $200

million in 1998.  In re Manhattan Inv. Fund III, 397 B.R. at 6.  Bear Stearns confronted

the Fund's principal – Michael Berger – who explained "that the discrepancy between the

losses sustained in the Bear Stearns account and the Fund's reported performance was due to the fact that the Fund used as many as eight other prime brokers to carry out its investment activities."  Id.  Bear Stearns found that explanation credible at the time, but a year later it decided to investigate Berger's story and quickly learned "that the Fund had only one prime broker."  Id. at 7.  Bear Stearns then reported the Fund to the SEC, leading to its rapid collapse and the disclosure that Berger was running a Ponzi scheme and had hidden losses of $394 million from investors.  Id. at 4, 7-8.

The Bankruptcy Court granted summary judgment against Bear Stearns on the trustee's actual fraudulent conveyance claim, holding as a matter of law that Bear Stearns had not been diligent, because it had not "consult[ed] easily obtainable sources of information . . . bear[ing] on the truth of [the] explanation it had received from the potential wrongdoer."  In re Manhattan Inv. Fund II, 359 B.R. at 524.  The District Court reversed, however, finding that – despite the ready availability of the information demonstrating Berger's fraud – it was a jury question whether Bear Stearns had conducted a "diligent investigation":  "we cannot conclude as a matter of law that Bear Stearns should have done in December 1998 what it eventually did in December 1999."  In re Manhattan Inv. Fund III, 397 B.R. at 25.

Similarly here, Appellees may argue to a finder of fact that Bayou's fraud could have been detected from "easily obtainable sources of information."  Whether a diligent investigation would necessarily lead to research of Richmond-Fairfield's

72

registration with the New York Department of State and its agent for service of process,

however, is a question that must be resolved by a jury.[37]

## VI.  CONSTRUCTIVE FRAUDULENT CONVEYANCE

The Bankruptcy Court granted summary judgment to Debtors on their

constructive fraudulent conveyance claims to the extent that Appellants' redemption

payments exceeded their investment principal – i.e., to the extent that Appellants'

redemption payments included fictitious profits.[38]  Bayou III, 396 B.R. at 843.

Claims of constructive fraudulent conveyance are governed by Section

548(a)(1)(B), which states that a debtor may avoid a transfer "if the debtor voluntarily or

involuntarily":

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. . . .

11 U.S.C. § 548(a)(1)(B).

--------

[37]  Altegris – as a broker-dealer subject to NASD regulations – was arguably in different circumstances than Appellants, who are hedge funds or private parties and entities not subject to NASD regulation.  (See Sonn. Br. at 43 n.14)  Whether Altegris is a fair comparator presents another question of fact for a jury.

[38]  It is undisputed that "the defendants gave reasonably equivalent value for their redemptions to the extent of their original investments."  Bayou III, 396 B.R. at 827.  Accordingly, the Debtors' constructive fraudulent conveyance claim is limited to any fictitious profits that were paid to Appellants.  See id. at 827-28.

In contrast to actual or intentional fraudulent conveyance claims, claims of constructive fraudulent conveyance "are based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee, not on fraud."  Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 460 (Bankr. S.D.N.Y. 2006) (citing In re White Metal Rolling and Stamping Corp., 222 B.R. 417, 428-29 (Bankr. S.D.N.Y. 1998); Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 319 (Bankr. S.D.N.Y. 1998)).  The parties agree that it is Debtors' burden to establish the elements of a constructive fraudulent conveyance, including insolvency and that Appellants provided less than reasonably equivalent value.  See Bayou III, 396 B.R. at 827.

The Sonnenschein and Freestone Appellants argue that Debtors failed to carry their burden of proving insolvency, contending that the Bankruptcy Court erred in admitting and relying on the opinion and analysis of Debtors' financial expert, William K. Lenhart, in finding insolvency.  (See Sonn. Br. 61; Freestone Br. 40-41).  Because the Lenhart Report was the only evidence offered by Debtors to demonstrate the Bayou Funds' insolvency, the admissibility of the Lenhart Report is critical to Debtors' constructive fraudulent conveyance claim.  As discussed below, however, this Court finds no error in the Bankruptcy Court's admission of the Lenhart Report.

The Sonnenschein Appellants further argue that they provided "reasonably equivalent value" to the Bayou Funds for both the return of their investment principal and the portion of their redemption payments reflecting fictitious profits.

A.    **Evidentiary Basis for Finding Insolvency**

Under Federal Rule of Evidence 702, where

> scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The requirements of Rule 702 are flexible and are liberally construed.

See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 594-95 (1993); see also Valentin v.

New York City, No. 94 Civ. 3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9,

1997) ("[A]n expert should not be required to satisfy an overly narrow test of his own

qualifications."); Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Del., Inc., No. 06 Civ.

12988 (SHS), 2009 WL 5173920, *2-3 (S.D.N.Y. Dec. 30, 2009).

Under Daubert, courts must focus "not on the substance of the expert's

conclusions, but on whether those conclusions were generated by a reliable

methodology."  Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 301 (S.D.N.Y. 2001); see

also Park W. Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 326-28 (S.D.N.Y.

2009).  "Faced with a proffer of expert scientific [or technical] testimony, then, the

[court] must determine . . . whether the expert is proposing to testify to (1) scientific [or

technical] knowledge and (2) will assist the trier of fact to understand or determine a fact

in issue.  This entails a preliminary assessment of whether the reasoning or methodology

underlying the testimony is scientifically valid and whether that reasoning or

methodology can be applied to the facts in issue."  Daubert, 509 U.S. at 592-93.

The Daubert principles apply to summary judgment proceedings.  Cortes-

Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 188 (1st Cir. 1997) ("The

Daubert regime can play a role during the summary judgment phase of civil litigation.  If

proffered expert testimony fails to cross <u>Daubert's</u> threshold for admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment.").  The Bankruptcy Court's admission of the Lenhart Report is reviewed under an abuse of discretion standard.  <u>Universal Church v. Geltzer</u>, 463 F.3d 218, 226 (2d Cir. 2006) (applying abuse of discretion standard on appeal of decision granting summary judgment) (citing <u>United States v. Cruz</u>, 363 F.3d 187, 192 (2d Cir. 2004)).

### 1.   Admissibility and Reliability of Lenhart Report

The Lenhart Report concludes that

> during the Testing Period [January 1, 2002 to August 31, 2005], the Bayou Funds were insolvent on an adjusted balance sheet basis, were operating with inadequate capital, and did not have the ability to pay debts as they became due.  Furthermore, [Lenhart found] that each redemption payment was made based on a reported account balance for such Defendant that was inflated above what should have been the value of the Defendant's Bayou Funds' account and bore no relationship to the Bayou Funds' financial condition or value.  Indeed, the amount that such payments were inflated is consistent with the values reported to investors and the fraudulent financial statements.

(Pltf. Ex. Vol. III (Lenhart Rpt.) at 38))  As Debtors argue (Bayou Br. 126), Lenhart's conclusions are hardly surprising in light of the undisputed fact that at the time of the Funds' collapse in August 2005, more than $250 million in investors' principal was found to have vanished.

### a.   Lenhart's Qualifications

As an initial matter, this Court finds that Lenhart was well qualified to conduct an insolvency analysis of the Bayou Funds.  Lenhart is a partner in BDO Seidman, LLP, a nationally recognized accounting, tax and consulting firm, and the national director of that firm's Consulting Business Restructuring Services Group.

76

(Lenhart Decl. at 2)  Lenhart has practiced as a public accountant for more than 25 years, and has developed an expertise in forensic accounting.  (Id. at 2-3)  He is a Certified Fraud Examiner, a Certified Turnaround Professional, and a Certified Insolvency and Restructuring Advisor – all designations awarded by the Association of Insolvency and Restructuring Advisors to recognize expertise in certain areas.  (Id. at 3)  Lenhart has provided accounting advice in numerous bankruptcy and distressed business situations and has served as a court-appointed examiner and as an Independent Examiner for the SEC.  (Id. at 4)  Lenhart has also testified as an expert witness in numerous insolvency proceedings.  (Id.)

Appellants' argument that Lenhart is not an expert on hedge fund accounting is immaterial.  As Lenhart explained, his report and its "conclusions do not rely on an accounting analysis specific to hedge funds.  The only hedge-fund-specific issue was the appropriate accounting for unredeemed principal as a fraudulent inducement liability – a legal issue with respect to which the Court has ruled. . . . [In any event,] the inclusion of contingent tort liabilities in a balance sheet insolvency analysis is standard."  (Lenhart Decl. at 2)  Moreover, "the BDO personnel with whom [Lenhart] consulted have extensive experience in the accounting treatment of hedge funds, financial fraud, and hedge fund fraud and insolvency. . . . BDO has more than 70 professionals devoted to servicing clients in the hedge fund industry."  (Id.)  As the Bankruptcy Court noted, the

> fact that Lenhart had not previously been engaged to examine the solvency of a hedge fund in no way supports defendants' argument that he is not qualified to do so.  There is nothing mystical or esoteric about a hedge fund which distinguishes it from other species of business and financial enterprise. . . .

> Lenhart's credentials as reflected in his curriculum vitae and his work product as reflected in the Report, the Declaration and the Exhibits thereto amply support the conclusion that it would be difficult to find a better qualified expert to perform these tasks of compilation, correlation and analysis.

Bayou III, 396 B.R. at 836.  Appellants do not seriously dispute Lenhart's qualifications, and based on his extensive experience and BDO's wide ranging professional expertise – including in hedge fund accounting – this Court finds that Lenhart and BDO were well suited to conduct the insolvency analysis.

### b.    Lenhart's Methodology

As to methodology, the Sonnenschein Appellants complain that Lenhart did not "go through the exercise of reconstructing a balance sheet reflecting assets and liabilities of each of the Bayou Hedge Funds at fair valuation at the time of the transfers." (Sonn. Br. 63)  Instead, Appellants argue,

> the Lenhart Report aggregates (1) cash balances for all bank and brokerage accounts for all of the Bayou Hedge Funds and select affiliated entities, (2) the Reconstructed Account Balances for redeeming and non-redeeming investors, and (3) assets held by Bayou Fund Affiliates (primarily private equity investments valued at cost) on a monthly basis. Then, Lenhart sets off against that alleged aggregate asset amount, the full amount of the capital contributions of the non-redeeming investors month by month.  This is not the transfer-by-transfer, plaintiff-by-plaintiff process found in a reliable insolvency report.

(Id.)

Insolvency is generally analyzed using the "'balance sheet test,' [which focuses on] whether the debtor's assets were exceeded by [its] liabilities at the time of the transfer."  Geltzer, 463 F.3d at 226 (citing 11 U.S.C. § 101(32)(A)); In re Centennial Textiles, Inc., 220 B.R. 165, 174 (Bankr. S.D.N.Y. 1998); In re Durso Supermarkets, Inc., 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996)).  Here, Lenhart's analysis involved a

three-prong approach, which included "an adjusted balance sheet test," "an insufficient capital or assets test," and "an inability to pay debts as they became due test." (Lenhart Rpt. at 6) With respect to the balance sheet test, Lenhart prepared "fair-valuation adjusted balance sheets, in the form of [] NAV calculation, for each month of the Testing Period [January 1, 2002 to August 31, 2005] based on a fair market value approach." (Lenhart Rpt. at 34) These balance sheets are attached to the Lenhart Report. (Pltf. Ex. Vol. III)

While Lenhart aggregated the assets of the four Bayou Funds, he adopted this approach because the Bayou entities – as part of their fraudulent scheme – commingled funds to such a degree that a fund-by-fund, month-by-month, investor-by-investor analysis would have been either impossible or unreliable. (Lenhart Rpt. at 22-25) Indeed, Lenhart's analysis revealed that Bayou "commingled cash and contributions from investors . . . without regard to the specific fund to which the investor had contributed." (Lenhart Rpt. at 22) The Sonnenschein Appellants criticize the aggregate treatment of the Bayou Funds' accounts, but fail to suggest any alternative that would not involve reliance on the admittedly fraudulent account records maintained and manipulated by Bayou's management.[39] Sonnenschein's expert Russell Kranzler, for example, fails to propose a method of reliably assessing the solvency of each Bayou Fund in the face of routine commingling and transfer of funds among the various Bayou accounts, the existence of which the Lenhart Report amply demonstrates. (Sonn. Ex. 42)

_____

[39] The Sonnenschein Appellants' arguments about aggregation also appear to have been waived. Bayou states in its brief that "Appellants did not object to Lenhart's aggregate treatment of the Bayou Hedge funds before the Bankruptcy Court, and therefore this argument is waived." (Bayou Br. 131). The Sonnenschein Appellants' Reply Brief does not respond to Bayou's waiver argument.

In short, Appellants' argument that Lenhart's aggregated balance sheet approach is unreliable is without foundation.[40]

The record demonstrates that Lenhart conscientiously pursued his insolvency analysis under extremely difficult conditions.  Lenhart relied on the financial records of the Bayou entities in only limited circumstances, turning instead to third-party bank and brokerage account statements.  As Lenhart notes, such third party materials are "customarily relied upon by experts in analyzing the financial condition of a company with unreliable financial statements."  (Lenhart Rpt. at 12)  Lenhart also independently utilized "a number of [his company's] own unique data files" created from scratch after considering "the forensic accounting efforts of Navigant Consulting," Debtors' financial

---

[40]  Freestone also objects to Lenhart's aggregation approach, arguing that it invested in only one Bayou Fund – the Bayou Accredited Fund – and that the solvency of this fund should have been analyzed separately.  (Freestone Br. 44-46)  As with the Sonnenschein Appellants, Freestone's aggregation argument appears to have been waived.  Freestone's brief opposing Bayou's motion for summary judgment does not argue that Lenhart should have separately considered the solvency of the Bayou Accredited Fund.  (Pltf. Ex. 12) Moreover, in its reply brief here, Freestone does not cite any submission it made in the Bankruptcy Court in which this issue was raised.  Instead, Freestone quotes language from the Bankruptcy Court's <u>Bayou III</u> opinion indicating that certain defendants had complained "about the Lenhart Report's consolidation of the Bayou assets and liabilities."  (Freestone Reply Br. 3)  It is clear from context (<u>Bayou III</u>, 396 B.R. at 838) that the Bankruptcy Court was addressing a different issue; this excerpt does not demonstrate that Freestone ever argued in Bankruptcy Court that the solvency of the Bayou Accredited Fund should have been separately considered.

In any event, even if Freestone had not waived this issue, its argument would fail for the same reasons discussed above.  Freestone has not shown that a disaggregated, fund-by-fund, solvency analysis was possible in the face of Bayou's concededly fraudulent records.  Bayou's accounts and records are plainly unreliable as evidence of actual, individual fund NAVs.  Accordingly, Freestone's argument that "a triable issue of fact exist[s] as to whether profits or losses were generated by Bayou Accredited during the period of Freestone's investment" (Freestone Br. 49) misses the mark, because it ignores the fact that this Court cannot rely on Bayou Accredited's records, or the records of any Bayou Fund, for purposes of determining the solvency of any particular Bayou Fund. Freestone's remaining argument – that investors' tort claims should not have been assessed as liabilities – is addressed and rejected below.

advisor.  (Id. at 12-13)  These files were mainly "comprised of bank and investment

account statements and available related documents, NAV reports, proofs of claims filed

by investors, periodic Bayou Funds communications with investors, and investor

contribution and redemption documents."  (Id. at 13)  Lenhart also "reviewed the Fund

and Non-Fund Entities' documents stored at [Debtors' attorneys'] offices and selected

additional documents for purposes of [his] analysis," including "electronic data obtained

from Iron Mountain and the United States Government."[41]  (Id.)

        The assets included in the Lenhart insolvency analysis "consist of bank

accounts (cash that already exists at market value) and the net equity (represented by the

market value of the portfolio) of the various investment accounts and private equity

investments," all at fair market value save the private equity investments, which were

valued at original cost in the absence of reliable information demonstrating present

value.[42]  (Id. at 25-27, 34; Lenhart Decl. at 4-9)  The only liabilities included in Lenhart's

---

[41]  Lenhart also verified his balance sheet analysis through a "proof of cash"
methodology, which involved collecting and analyzing all cash activity of the Bayou
entities for each month in the testing period in order to prevent "material misstatement in
the assets underlying the NAV calculation."  (Lenhart Decl. at 9-10)  In other words, any
assets liquidated during the testing period or not revealed on bank or brokerage account
statements were accounted for.  "The result of these analyses cross-validated [Lenhart's]
methodology" and confirmed that Lenhart "could use bank statements . . . for purposes of
[his] NAV calculations. . . . [and] that the bank statements were the best available
financial data to render an opinion of the financial condition of the Bayou Funds."
(Lenhart Rpt. at 19)

[42]  Lenhart's adjusted balance sheet departed from the standard fair valuation of assets
approach only in assigning value to Bayou's private equity investments, for which no
reliable public value information was available.  (Lenhart Rpt. at 34)  Contrary to the
Sonnenschein Appellants' argument, it is not the case that Lenhart "never conducted any
investigation into the value of the Bayou Funds' or their affiliates' interest in these
[private equity] investments."  (Sonn. Br. 65)  Lenhart examined all available public
information that could shed light on the value of these private equity investments, but

analysis were the Bayou Funds' "legal tort liabilit[ies] to their investors for the full amount of their investments based on rescission for fraud." Bayou III, 396 B.R. at 838; see Bayou II, 372 B.R. at 664-65.

Appellants argue that "case law does not support treating liabilities for which the debtor is not legally bound to pay at the valuation date as 'debts' for purposes of insolvency." (Sonn. Br. 64) The cases cited are inapplicable, however, because they involve liabilities that had not yet accrued.[43] Here, the tort claims of the non-redeeming investors in the Bayou Funds accrued prior to the Testing Period, because they were founded on fraudulent misrepresentations made at the time of initial investment. (Sonn. Br. 64-65) As the Bankruptcy Court explained,

> in an ordinary corporate balance sheet solvency analysis[,] equity interests in the corporation do not constitute liabilities and are not treated as such on the balance sheet. But the Bayou hedge funds were not ordinary corporations, the tort liability of the Bayou hedge funds to their investors based upon rescission for fraud was not analogous to shareholder equity interests in a corporation, and this was not an ordinary corporate solvency analysis. Unlike a corporation which has no liability to its shareholders, it is a given in these adversary proceedings (which both sides must and do acknowledge) that the Bayou hedge funds had a legal tort liability to their

concluded that "cost is the appropriate measure of a fair valuation" for non-public equity investments. (Lenhart Dep. 250-51; Lenhart Decl. at 17-23)

[43] FSP, Inc. v. Societe Generale, No. 02 Civ. 4786 (GBD), 2005 WL 475986, at *15 (S.D.N.Y. Feb. 28, 2005) (discussing only "hypothetical existence of liabilities from future tort claims"); Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.), 313 B.R. 812, 821 (Bankr. E.D. Ark. 2004) ("Although [insolvency analysis] may have reasonably estimated the amount of . . . potential future claims, there was no injury or claim against the debtor as of [the date it filed its petition for bankruptcy]. The Court must review a 'snapshot' of the balance sheet as of the date of transfers to determine the solvency of the debtor corporation. . . . [B]ankruptcy law requires the Court to look at the balance sheet solvency as of the date of the transfers. That view does not include potential future claims."(emphasis added)); Dery v. Cumberland Cas. & Surety Co. (In re 5900 Assocs., L.L.C.), 317 B.R. 332, 334-35 (Bankr. E.D. Mich. 2004) (holding that fees paid by debtor to attorney not approved for payment by Bankruptcy Court, as required by law, could not be included in solvency analysis).

> investors for the full amount of their investments based on rescission for
> fraud.  As such, the investors were and are creditors. . . . The purpose of
> the Lenhart solvency analysis was precisely to determine whether the
> Bayou hedge funds' liability to their investors was backed by assets.

Bayou III, 396 B.R. at 838.

"[I]n tort cases[,] the relationship of debtor and creditor arises the moment the cause of action accrues."  Shelly v. Doe, 249 A.D.2d 756, 757 (3d Dep't 1998); accord Marcus v. Kane, 18 F.2d 722, 723 (2d Cir. 1927).  Here, the parties do not dispute that the non-redeeming investors "'had the right prior to the filing of the petition to pursue claims for damages or rescission against the Bayou Hedge Funds,'" because they were "fraudulently induced to purchase their investments in the Funds by the fraudulent financial statements certified by the non-existent accounting firm."  Bayou II, 372 B.R. at 665 (quoting defendants' brief below (citing cases holding that defrauded investors are tort creditors)).  The non-redeeming investors' claims accrued at the moment of the fraudulent inducement and therefore were liabilities of Debtors throughout the Testing Period.  See also Travellers Int'l, AG v. Trans World Airlines (In re TWA), 134 F.3d 188, 197-198 (3d Cir. 1998) (holding that contingent liabilities were properly part of liability calculation for insolvency analysis) (citing FDIC v. Bell, 106 F.3d 258, 264 (8th Cir. 1997)); Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.), 313 B.R. 812, 819-20 (Bankr. E.D. Ark. 2004) ("After the proper valuation of the contingent liability has been determined, it becomes a factor in the Court's balance sheet insolvency test.").

If anything, the Lenhart Report likely overstates assets and understates liabilities.  For example, Lenhart's asset calculation includes assets held by Bayou Management and Bayou Securities, when only the assets of the Bayou Hedge Funds are relevant to their solvency.  (Lenhart Rpt. at 19, 24, 26)  The Report also excludes many

potential liabilities, and includes only the tort liabilities for purposes of determining solvency.  (Id. at 7, 19, 25, 26-27)

Although it is Debtors' burden to demonstrate insolvency and provide reliable expert testimony, Appellants cannot – in the face of the exhaustive analysis conducted by an expert as qualified as Lenhart – credibly assert fatal flaws in his analysis without supporting evidence of their own.  The conclusory statements contained in Appellants' briefs – without citation to contradictory evidence or independent expert analysis – do not raise material issues of fact as to the Bayou Funds' insolvency or the possibility of conducting a solvency analysis on a non-aggregated basis.

Finally, Appellants argue that because "[t]here is no direct insolvency testimony or business records offered in the record or available at trial to substantiate the Debtors' claim," Debtors have not satisfied their burden to prove insolvency.  While Appellants do not challenge or raise concerns about the authenticity of the documents Lenhart relied on, they contend that Lenhart improperly relied on these documents because they "were never authenticated or admitted in the record and are not admissible to prove any of the underlying facts."  (Sonn. Br. 66)  Under Fed. R. Evid. 703, however, Lenhart was entitled to rely on the bank and brokerage statements and other data files in compiling his report.

Fed. R. Evid. 703 provides that "facts or data [relied on by an expert] need not be admissible in evidence in order for the opinion or inference to be admitted," so long as the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703; see also Hirsch v. LoPreato (In re Colonial Realty Co.), 209 B.R. 819, 822 (Bankr. D.

Conn. 1997) ("An expert may rely upon facts and data which are inadmissible as long as the expert's reliance upon such materials is reasonable.").  That an expert has relied on such facts and data does not undermine the evidentiary value of the expert's testimony or analysis.  The cases cited by Appellants (Sonn. Br. 66-67) are not to the contrary.  See In re James Wilson Assocs., 965 F.2d 160, 172-73 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him – information of which he lacks first-hand knowledge and which might not be admissible. . . . ); Fisher v. Prime Table Rest. & Lounge, Inc. (In re Lake States Commodities, Inc.), 271 B.R. 575, 587-88 (Bankr. N.D. Ill. 2002) (no weight given to expert analysis of insolvency where report was incomplete and expert had simply relied "on what the Trustee told him"); Barber v. Prod. Credit Servs. of W. Ill. (In re KZK Livestock, Inc.), 290 B.R. 622, 627-29 (Bankr. C.D. Ill. 2002) (expert relied on debtor's poorly maintained records).

Here, Lenhart did not base his expert opinion on information handed to him by others, nor did he base his opinion on Bayou's fraudulent records.  Instead, the Lenhart Report's conclusions are founded on an independent review of source materials and raw data – much of which was produced by third parties – validated by a proof of cash analysis.  Lenhart has first-hand knowledge of these materials.  Indeed, he is the only source of first-hand knowledge before the Court, given that no other expert examined and compiled Debtors' financial data and computed their solvency.

Rule 1006 provides that "voluminous writings, recordings, or photographs which cannot conveniently be examined in court" may "be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.  As the Bankruptcy Court held, the

compilations and summaries included in the Lenhart Report and attached to Lenhart's declarations clearly fall under Rule 1006 and are therefore properly considered.  Bayou III, 396 B.R. at 841.

*    *    *    *

In sum, Appellants have not demonstrated that the Bankruptcy Court abused its discretion in admitting and in relying on the Lenhart Report to conclude that the Bayou Funds were insolvent at the time that the transfers to Appellants were made.

**B.  "Reasonably Equivalent Value" Was
Not Provided for Fictitious Profits**

The Bankruptcy Court noted that

> "virtually every court to address the question has held unflinchingly 'that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers.'"

Bayou I, 362 B.R. at 636 (quoting Soule v. Alliot (in re Tiger Petroleum Co.), 319 B.R. 225, 239 (Bankr. N.D. Okla. 2004) and citing Sender v. Buchanan (In re Hedged-Investments Assoc., Inc.), 84 F.3d 1286, 1290 (10th Cir. 1996); Scholes, 56 F.3d at 757; Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 595 n.6 (9th Cir. 1991); Terry, 432 F. Supp.2d at 642-43; Rieser, 343 B.R. at 643-45).

The Sonnenschein Appellants argue, however, that they provided "reasonably equivalent value" to the Bayou Funds, not just as to their redeemed principal, but also as to the fictitious profits reflected in their redemption payments.  Accordingly, they contend that the fictitious profits component of their redemption payments is not voidable as a constructive fraudulent conveyance.  (Sonn Br. 69-72)  In support of this argument, the Sonnenschein Appellants cite fraudulent conveyance cases in which courts refused to void transfers that reflected both a return of principal and a reasonable gain or

86

profit.  (Id. at 69)  These cases are distinguishable, however, because they involved

commercially reasonable, contractually guaranteed rates of return.  See In re Carrozella &

Richardson, 286 B.R. 480, 484-91 (D. Conn. 2002) (contractual interest rates constituted

reasonably equivalent value for use of money); Lustig v. Weisz & Assocs. (In re Unified

Commercial Capital), No. 01 MBK 6004 (L), 2002 WL 32500567, at *8 (W.D.N.Y. June

21, 2002) ("the payments to [the defendant] were not simply payments of nonexistent

profits, but of a contractually provided-for, commercially reasonable rate of interest on

what amounted to a loan").  Here, the fictitious profits Appellants received were not

promised to them when they initially invested in the Bayou Funds, and cases in which

parties invested on the basis of an explicit promise of a repayment greater than principal

are thus not on point.

Appellants also argue that the fictitious profits they received should be

treated as pre-judgment interest.  This novel argument, unsupported by any case law, is

unpersuasive.  The pre-judgment interest remedy does not provide an independent cause

of action that accrues to Appellants' benefit at the moment of redemption.  It is a make-

whole remedy ordered by the Court once a final judgment for a sum certain is entered,

see N.Y.C.P.L.R. § 5001, and no such judgment has been entered here.  Moreover,

Appellants collected the debt owed them – their initial investment – and thus there is no

sum upon which pre-judgment interest could attach.  See Hammond v. Carthage Sulphite

Pulp & Paper Co., 34 F.2d 157, 158 (N.D.N.Y. 1928) ("Interest, except in cases where

there is a contract to pay it, does not constitute a debt capable of a distinct claim. . . .

[T]he acceptance of the principal, even under protest, without a separate agreement for

the payment of interest, extinguishes the claim and bars a claim for its payment."); see also 47 C.J.S. Interest & Usury § 136 (West 2009).[44]

> In sum, an investor
>
> is entitled to his profit only if the payment of that profit to him, which reduced the net assets of the estate now administered by the receiver, was offset by an equivalent benefit to the estate. . . . A profit is not offset by anything; it is the residuum of income that remains when costs are netted against revenues.  The paying out of profits to [the investor] not offset by further investments by him confer[s] no benefit on [] but merely deplete[s] [the] resources [of the debtor] faster.

Scholes, 56 F.3d at 757 (citing Merrill v. Abbott (In re Indep. Clearing House Co.), 77 B.R. 843, 857-59 (D. Utah 1987)).  Because Appellants provided no value in exchange for the fictitious profits they received, that portion of their redemption payments is voidable as a constructive fraudulent conveyance.

## VII.   APPELLANTS' ROLLOVER INVESTMENT IN SUCCESSOR BAYOU FUNDS DOES NOT CONSTITUTE A NEW INVESTMENT FOR PURPOSES OF CALCULATING LIABILITY

The Sonnenschein Appellants argue that any fraudulent conveyance liability should be calculated on the basis of their investment in one or more of the successor Bayou Funds created in February 2003.  (Sonn. Br. 72)  At that time, the original Bayou Fund was terminated and its investors were given the option to redeem their investments or transfer their investment balance into one of the new Funds.  Appellants argue that, "[f]rom a Federal tax and securities law perspective, the exchange

_____

[44] Randall v. Loftsgaarden, 478 U.S. 647 (1986), cited by the Sonnenschein Appellants (Sonn. Br. 71-72), has no applicability here.  In that case, the Supreme Court rejected defendants' argument that rescission damages should be offset by certain tax benefits plaintiff had received, holding that a defrauded investor's recovery need not be limited to "net economic loss."  This case provides no support for Appellants' argument that fictitious profits are not voidable as a constructive fraudulent conveyance.

of the investment from Bayou Fund to one of the Bayou Hedge funds in February 2003

constituted a new investment on the part of the investor.  Thus, the principal investment

of each Sonnenschein Investor should be based upon the investment as of the date of the

investment in one [of the successor] Bayou Hedge Funds."  (Id. at 72-72)

> The Bankruptcy Court rejected this argument, noting that
>
>> it ignores the fact that these Sonnenschein defendants' actual investments
>> in the Bayou hedge funds were less than the amounts reflected on their
>> Bayou Fund final account statements.  To the extent that a defendant's
>> Bayou Fund account exceeded his proportionate share of the net asset
>> value of the Bayou Fund, that defendant's purported investment in one of
>> the new Bayou hedge funds was inflated to the same extent. . . . [I]n no
>> event is it appropriate to pile fiction on fiction by deeming these investors'
>> final Bayou Fund account statements, including fictitious profits, to be the
>> value of their investments contributed to the Bayou hedge funds.

Bayou III, 396 B.R. at 884-85.

As the Lenhart Report demonstrates, Debtors were insolvent in February

2003, and Appellants' accounts were worth less at that time than the amount of their

initial investment.  (See Pltf. Exs. 3-5; Lenhart Decl. Ex. 4)  Moreover, the only "value"

Appellants provided at the time of the 2003 exchange was in the form of their original

Bayou Fund investment.  As explained above, this Court cannot find that the closing

balances in the original Bayou Fund, or the February 2003 opening balances in the

successor funds, were worth what Bayou reported them to be worth at the time.  Instead,

Bayou inflated their value in furtherance of the larger fraud scheme.  Cases holding that

an exchange of stock constitutes a new investment under securities and tax law (see

Sonn. Br. 73) are not persuasive here, where the purported value of the exchange was

itself fictional and fraudulent.  Accordingly, the Bankruptcy Court's rejection of

Appellants' argument was proper.

## CONCLUSION

For the reasons stated above, the Bankruptcy Court's October 16, 2008 decision and January 28, 2009 orders relating to Appellants[45] are affirmed in part and reversed in part: (1) the orders granting Debtors summary judgment on their actual fraudulent conveyance claims against Appellants are REVERSED and these claims will proceed to trial; (2) the orders granting Debtors summary judgment on their constructive fraudulent conveyance claims against Appellants – to the extent Appellants' redemption payments include fictitious profits – are AFFIRMED; and (3) the orders denying Appellants' cross-motions for summary judgment are AFFIRMED.

Dated: New York, New York
      September 17, 2010

                    SO ORDERED.

                    _Paul G. Gardephe_
                    Paul G. Gardephe
                    United States District Judge

---

[45] 09 Civ. 2313 (S.D.N.Y), Docket No. 1 (Redwood Growth Partners, L.P. Final Judg.); 09 Civ. 2340 (S.D.N.Y.), Docket No. 1 (D. Canale Beverages, Inc. Final Judg.); 09 Civ. 2343 (S.D.N.Y.), Docket No. 1 (Heritage Hedged Equity Fund LP Final Judg.); 09 Civ. 2345 (S.D.N.Y.), Docket No. 1 (John D. Canale III Final Judg.); 09 Civ. 2347(S.D.N.Y.), Docket No. 1 (Mary P. Smythe Residuary Trust Final Judg.); 09 Civ. 2351(S.D.N.Y.), Docket No. 1 (Marvin E. Bruce Living Trust Final Judg.); 09 Civ. 2353 (S.D.N.Y.), Docket No. 1 (Freestone Final Judg.); 09 Civ. 2577(S.D.N.Y.), Docket No. 1 (CBHSE Final Judg.).